## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

_____

| | |
|---|---|
| HISTEEL CO., LTD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| And | ) |
| | ) |
| DONG-A-STEEL CO., LTD, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| NUCOR TUBULAR PRODUCTS INC. | ) |
| | ) |
| Defendant-Intervenor. | ) |

Court No. 22-00142

**PUBLIC VERSION**

_____

## DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

<div style="margin-left: 40%;">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

</div>

OF COUNSEL:
VANIA WANG
Attorney
Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement & Compliance

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station

Washington, D.C.  20044
Tel: (202) 305-7571
December 21, 2022                                        Attorneys for Defendant

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2(c)(1) ................................................................2

    I.    Administrative Determination Under Review.......................................................2

    II.    Issues Presented For Review ...............................................................................2

STATEMENT OF FACTS .........................................................................................2

SUMMARY OF THE ARGUMENT............................................................................4

ARGUMENT...............................................................................................................5

    I.    Standard Of Review .............................................................................................5

    II.    Commerce's Use Of The Cohen's *d* Test In Its Differential Pricing Analysis Was In Accordance With Law, Reasonable, And Supported By Substantial Evidence ..................................................................................................................7

        A.    Commerce's Differential Pricing Analysis..............................................7

        B.    Commerce's Use Of The Cohen's *d* Test Is In Accordance With Law......9

            1.    Commerce's Use Of The Cohen's *d* Test Reasonably Carries Out The Purpose Of The Statute And Determines Whether U.S. Prices Differ Significantly Between Purchasers, Regions, Or Time Periods......................................................................................................9

            2.    *Stupp* Did Not Invalidate Commerce's Lawful Use Of The Cohen's *d* Test .......................................................................................11

            3.    HiSteel Improperly Cites Untimely New Factual Information Which Was Not Before Commerce ...........................................12

            4.    The Requirements For Statistical Significance Does Not Affect Commerce's Use Of The Cohen's *d* Test For Practical Significance ...............................................................................13

    III.    Substantial Evidence Supports Commerce's Adjustment To Slitting Services....15

IV.     Substantial Evidence Supports Commerce's Adjustment To The Scrap Offset... 18

CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

## CASES

*Am. Tubular Prod., LLC v. United States,*
   847 F.3d 1354 (Fed. Cir. 2017) ....................................................... 19

*Apex Frozen Foods Private Ltd. v. United States,*
   37 F. Supp. 3d 1286 (Ct. Int'l Trade 2014) ...................................... 9

*Apex Frozen Foods Private Ltd. v. United States,*
   862 F.3d 1337 (Fed. Cir. 2017) .................................................. 7, 9

*Atl. Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984) ....................................................... 6

*Carpenter Tech. Corp. v. United States,*
   452 F. Supp. 2d 1344 (Ct. Int'l Trade 2006) ............................ 12, 13

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ....................................................................... 6

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ....................................................................... 5

*Corus Staal BV v. United States,*
   502 F.3d 1370 (Fed. Cir. 2007) ................................................ 20, 21

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ....................................................... 5

*Itochu Bldg. Prods. v. United States,*
   733 F.3d 1140 (Fed. Cir. 2013) ..................................................... 20

*JBF RAK LLC v. United States,*
   790 F.3d 1358 (Fed. Cir. 2015) ................................... 7, 9, 10, 15

*Juancheng Kangtai Chem. Co. v. United States,*
   No. 14-00056, 2015 WL 4999467 (Ct. Int'l Trade Aug. 21, 2015) ................................... 19

*Maverick Tube Corp. v. United States,*
   107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ............................ 20, 21

*Mid Continent Steel & Wire, Inc. v. United States,*
   940 F.3d 662 (Fed. Cir 2019) ............................................. 9, 14, 15

*Nippon Steel Corp. v. United States,*
   458 F.3d 1345 (Fed. Cir. 2006) ..................................................... 6

*PAM, S.p.A. v. United States,*
   582 F.3d 1336 (Fed. Cir. 2009) ..................................................... 5

*Paul Muller Industrie GmbH & Co. v. United States*,
    502 F. Supp. 2d 1271 (Ct. Int'l Trade 2007) ................................................ 20

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ..................................................................... 20

*Shandong Huarong Gen. Corp. v. United States*,
    159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ................................................... 6

*SKF USA, Inc. v. United States*,
    116 F. Supp. 2d 1257 (Ct. Int'l Trade 2000) ........................................... 16, 17

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ......................................................... 9, 11, 12, 14

*Timken Co. v. United States*,
    354 F.3d 1334 (Fed. Cir. 2004) ....................................................................... 6

*Tri Union Frozen Prod., Inc. v. United States*,
    163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ................................................. 12

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ..................................................................................... 5, 6

## STATUTES

19 U.S.C. § 1675 ..................................................................................................... 7
19 U.S.C. § 1677b ........................................................................................... 15, 16
19 U.S.C. § 1677f-1 ........................................................................................ 7, 8, 9

## REGULATIONS

19 C.F.R. § 351.301 ............................................................................................. 12
19 C.F.R. § 351.309 ....................................................................................... 19, 20
19 C.F.R. § 351.401 ............................................................................................. 18
19 C.F.R. § 351.414 ............................................................................................... 8

## ADMINISTRATIVE DETERMINIATIONS

*Circular Welded Non-Alloy Steel Pipe from Korea*,
    63 Fed. Reg. 32833 (Dep't of Commerce June 16, 1998) ............................. 17

*Certain Oil Country Tubular Goods from Mexico*,
    71 Fed. Reg. 54,614 (Dep't of Commerce Sept. 18, 2006) ........................... 16

*Polyethylene Retail Carrier Bags from Thailand*,
    72 Fed. Reg. 1,982 (Dep't of Commerce Jan. 17, 2007) ............................... 16

*Certain Oil Country Tubular Goods from the Republic of Korea,*
  82 Fed. Reg. 18,105 (Dep't of Commerce Apr. 17, 2017)................................................. 13

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
  85 Fed. Reg. 68,840 (Dep't of Commerce Oct. 30, 2020)................................................. 2

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea,*
  86 Fed. Reg. 35,060 (Dep't of Commerce July 1, 2021)................................................. 18

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea,*
  86 Fed. Reg. 55,582 (Dep't of Commerce Oct. 6, 2021) ................................................. 3

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea,*
  87 Fed. Reg. 20,390 (Dep't of Commerce Apr. 7, 2022) ................................................. 2

*Certain Softwood Lumber Products From Canada,*
  87 Fed. Reg. 48,465 (Dep't of Commerce Aug. 9, 2022)........................................... 10, 11

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

_____
|                                          |
| HISTEEL CO., LTD,                        )
|                                          )
|                  Plaintiff,              )
|                                          )
|         and                              )
|                                          )
| DONG-A-STEEL CO., LTD,                   )
|                                          )
|                  Plaintiff-Intervenor,   )
|                                          )
|         v.                               )      Court No. 22-00142
|                                          )
| UNITED STATES,                           )      **PUBLIC VERSION**
|                                          )
|                  Defendant,              )
|                                          )
|         and                              )
|                                          )
| NUCOR TUBULAR PRODUCTS INC.,             )
|                                          )
|                  Defendant-Intervenor.   )
|_____)

## DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motions for judgment upon the agency record filed by Plaintiff HiSteel Co., Ltd. (HiSteel), ECF No. 43, and plaintiff-intervenor Dong-A-Steel Co., Ltd. (DOSCO), ECF No. 45.  HiSteel and DOSCO challenge certain aspects of the Department of Commerce's (Commerce's) final results in the 2019-2020 antidumping duty administrative review covering heavy walled rectangular welded carbon steel pipes and tubes (HWR) from the Republic of Korea (Korea).  For the reasons explained below, the Court should sustain the final

1

results because they are supported by substantial evidence and are otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I.    Administrative Determination Under Review

Plaintiffs challenge Commerce's final results in the 2019-2020 antidumping duty administration review covering heavy walled rectangular welded carbon steel pipes and tubes (HWR) from Korea. *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, 87 Fed. Reg. 20,390 (Dep't of Commerce Apr. 7, 2022) (final admin. review) (P.R. 243), and accompanying Issues and Decision Memorandum (Dep't of Commerce Apr. 1, 2022) (IDM) (P.R. 241). The administrative review covers entries or sales of HWR from Korea made September 1, 2019, through August 31, 2020.

### II.   Issues Presented For Review

1.    Whether Commerce's use of the Cohen's *d* test as part of Commerce's differential pricing analysis is in accordance with law, reasonable, and supported by substantial evidence.

2.    Whether substantial evidence supports Commerce's application of transactions disregarded to slitting services.

3.    Whether substantial evidence supports Commerce's application of transactions disregarded to scrap for the scrap offset.

## STATEMENT OF FACTS

On October 30, 2020, Commerce initiated an administrative review of an antidumping duty order covering HWR from Korea. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 68,840 (Dep't of Commerce Oct. 30, 2020) (initiation notice) (P.R. 16). Commerce selected DOSCO and HiSteel for individual examination as

mandatory respondents based on United States Customs and Border Protection (CBP) data.
Respondent Selection Memorandum (Dec. 3, 2020) (P.R. 21, C.R. 3).

On October 6, 2021, Commerce published its preliminary results. *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, 86 Fed. Reg. 55,582 (Dep't of Commerce Oct. 6, 2021) (*Preliminary Results*) (P.R. 210), and accompanying decision memorandum (PDM) (P.R. 207). Commerce applied the transactions disregarded rule to HiSteel's reported costs to reflect the higher of the transfer price or market price of slitting services obtained from an affiliated supplier. PDM at 19. When determining constructed value and cost of production, can reject using values in the respondent's books and records for affiliated transactions which do not fairly reflect the value usually reflected in sales of the merchandise under consideration, in the market under consideration. Commerce also adjusted HiSteel's reported scrap offset to account for scrap sales to an affiliated customer that Commerce determined were not made at arm's length prices. *Id.*

Commerce applied its differential pricing analysis to HiSteel's U.S. sales and preliminarily found that 99.48 percent of the value of U.S. sales pass the Cohen's *d* test and confirmed the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. *Id.* at 7. Commerce preliminarily determined that the average-to-average method could not account for such differences and applied the average-to-transaction method to all U.S. sales to calculate the weighted-average dumping margin for HiSteel. *Id.*

Commerce preliminarily calculated antidumping rates of 1.62 percent for DOSCO and 10.24 percent for HiSteel. *Preliminary Results*, 86 Fed. Reg. at 55,583.

After considering the interested parties' comments on the preliminary results, Commerce issued its final results. In the final results, Commerce continued to apply the transactions

3

disregarded rule to HiSteel's reported costs to reflect the higher of the transfer price or market price of slitting services obtained from an affiliated supplier but corrected clerical errors. IDM at 55-56.  Commerce also continued to adjust HiSteel's reported scrap offset to account for scrap sales to an affiliated customer that it determined were not made at arm's length prices.  *Id.* at 57.

Commerce also continued to apply its differential pricing analysis to HiSteel's U.S. sales and determined that 99.48 percent of the value of U.S. sales pass the Cohen's *d* test and again confirmed the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  *Id.* at 14-15.  Commerce again determined that the average-to-average method could not account for such differences and applied the average-to-transaction method to all U.S. sales to calculate the weighted-average dumping margin for HiSteel.  *Id.* at 15.

Commerce calculated weighted-average dumping margins of 1.61 percent for DOSCO and 10.24 percent for HiSteel.  *Final Results*, 87 Fed. Reg. at 20,391.

## SUMMARY OF THE ARGUMENT

First, Commerce lawfully and reasonably used the Cohen's *d* test in its differential pricing analysis.  Commerce used the Cohen's *d* test to carry out the purpose of the statute as the first step of its differential pricing analysis is to determine whether U.S. prices differ significantly among purchasers, regions or time periods.  Moreover, HiSteel's claims regarding the requirements needed to use the Cohen's *d* test are not supported by the record and are not applicable because Commerce used the full population of U.S. sales prices included in the test and comparison groups within the Cohen's *d* test, not samples of each such populations.  Further, while HiSteel cites various academic literature in support of its arguments, it failed to place that information on the record, and the Court should decline to consider it.

Second, Commerce's application of transactions disregarded to HiSteel's affiliated supplier's slitting services is reasonable and supported by substantial evidence because record evidence demonstrated that all the services pertained to slitting and, contrary to HiSteel's claim, did not necessarily demonstrate a price schedule.

Finally, Commerce's application of transactions disregarded to the scrap offset is also reasonable and supported by substantial evidence because the record did not demonstrate that skelp scrap and pipe scrap have sufficiently different properties that the scrap should not be combined for the purposes of calculating the scrap offset.

## **ARGUMENT**

### I.   **Standard Of Review**

In reviewing final results of Commerce's antidumping duty administrative reviews, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (*quoting* 19 U.S.C. § 1516a(b)(1)(B)).

"The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  Further, even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001).

When the Court examines Commerce's interpretations of the statute it administers, it employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent. *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted). The Court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. Indeed, "the whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Eurodif*, 555 U.S. at 316.

Finally, this Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.*

## II.    Commerce's Use Of The Cohen's *d* Test In Its Differential Pricing Analysis Is In Accordance With Law, Reasonable, And Supported By Substantial Evidence

### A.    Differential Pricing Analysis Background

In an antidumping proceeding, the statute directs Commerce to determine whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (or constructed export price) and the normal value of merchandise. 19 U.S.C. § 1675(a)(2)(A). To perform this pricing comparison, Commerce may use one of three methodologies:

(1) Average-to-transaction (A-T), in which Commerce compares the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions.

(2) Average-to-average (A-A), in which Commerce compares the weighted average of the normal values to the weighted average of the export prices (or constructed export prices).

(3) Transaction-to-transaction (T-T), in which Commerce compares the normal value of an individual transaction to the export price (or constructed export price) of an individual transaction.

*Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1340-41 (Fed. Cir. 2017) (citing *Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013)).

In general, antidumping duties are to be calculated using the average-to-average method or "comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise." 19 U.S.C. § 1677f-

1(d)(1)(A)(i); *see also* 19 C.F.R. § 351.414(c)(1) ("the Secretary will use the average-to-average

method unless the Secretary determines another method is appropriate in a particular case.").

Commerce "will use the transaction-to-transaction method only in unusual situations, such as

when there are very few sales of subject merchandise and the merchandise sold in each market is

identical or very similar or is custom-made." 19 C.F.R. § 351.414(c)(2). The average-to-

transaction method can also be used when "there is a pattern of export prices (or constructed

export prices) for comparable merchandise that differ significantly among purchasers, regions, or

periods of time," and Commerce explains why such differences cannot be taken into account

using the average-to-average method. 19 U.S.C. § 1677f-1(d)(1)(B).

   Commerce uses its differential pricing analysis to determine whether the average-to-

transaction method may be used rather than one of the standard comparison methodologies.

PDM at 6. In the first stage of the differential pricing analysis, the Cohen's *d* test is applied to

determine the whether the respondent's pricing behavior, as exhibited in its reported prices in the

U.S. market, differed significantly between purchasers, regions, or time periods. *Id.* at 6-7.

Next, the ratio test assesses the extent of the significant price differences for all sales as

measured by the Cohen's *d* test to determine whether there exists a pattern of prices that differ

significantly. *Id.* at 7.

   Then, in the second stage of the differential pricing analysis, Commerce examines

whether using only the average-to-average method can appropriately account for such

differences. *Id.* Even if some of a respondent's sales pass the Cohen's *d* test, if the ratio test

shows less than 33 percent of total sales passes the Cohen's *d* test (*i.e.*, there is no pattern) or that

the average-to-average method can appropriately account for such differences, then Commerce

will use the average-to-average method. *Id.* However, if Commerce finds that a pattern exists,

and that the average-to-average method cannot account for such differences, then Commerce may resort to an alternative comparison methodology based on the average-to-transaction method.  *See* 19 U.S.C. § 1677f-1(d)(1)(B).

    **B.**        **Commerce's Use Of The Cohen's *d* Test Is In Accordance With Law**

Commerce's use of the Cohen's *d* test is in accordance with law because it reasonably carries out the purpose of 19 U.S.C. § 1677f-1(d)(1)(B).  HiSteel's contrary arguments largely rely on a recent decision from the United States Court of Appeals for the Federal Circuit in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), but these arguments are not supported by the record.

          **1.**       **Commerce's Use Of The Cohen's *d* Test Reasonably Carries Out The Purpose Of The Statute And Determines Whether U.S. Prices Differ Significantly Between Purchasers, Regions, Or Time Periods**

Commerce's differential pricing analysis is a gap-filling exercise intended to carry out the purpose of 19 U.S.C. § 1677f-1(d)(1)(B).  *See Apex Frozen Foods Private Ltd. v. United States*, 37 F. Supp. 3d 1286, 1302 (Ct. Int'l Trade 2014) (applying *Chevron* deference in the context of Commerce's interpretation of 19 U.S.C. § 1677f-1(d)(1)).  Thus "the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence."  *Stupp*, 5 F.4th at 1353 (citations omitted); *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir 2019) ("In carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints"); *Apex Frozen Foods Private Ltd.*, 862 F.3d at 1346 (holding Commerce's "meaningful difference" test to be "reasonable"); *JBF RAK LLC*, 790 F.3d at 1363, 1367 (holding that Commerce's interpretation of 19 U.S.C. § 1677f-1(d)(1)(B)(i) was reasonable and that "{b}ecause Congress did not provide for a direct methodology, Commerce properly 'fill{ed} th{at} gap").

The Cohen's *d* test is used to determine whether the reported prices in the U.S. market, differ significantly between purchasers, regions, or time periods. PDM at 6-7. "The Cohen's *d* coefficient is based on the difference between the means of the test and the comparison groups relative to the variances within the two groups," *i.e.*, the standard deviation. IDM at 19-20. When the difference in the weighted-average sale prices between the two groups is measured relative to the standard deviation, "then this value is expressed in standardized units, and is based on the dispersion of the prices within each group." *Id.* at 20; *see also Certain Softwood Lumber Products From Canada*, 87 Fed. Reg. 48,465 (Dep't of Commerce Aug. 9, 2022), and accompanying IDM at Comment 2.

"In other words, the 'significance' of differences between the average prices of the test group and the comparison group (*i.e.*, between a specific purchaser, region or time period and all other purchasers, regions, or time periods, respectively) is measured by how widely the individual prices differ within these two groups." IDM at 20. "When there is little variation in prices within each of these groups (i.e., not between the two groups), then a small difference in the mean prices of the test and comparison groups will be found to be significant." *Id.* "Conversely, when there are wide variations in prices within each of these groups, then a much larger difference in the mean prices of the test and comparison groups will be necessary in order to find that the difference is significant." *Id.*

Consequently, Commerce uses "the Cohen's *d* coefficient as a measure of effect size to determine whether the observed price differences are significant." *Id.* "In this application, the difference in the weighted-average (*i.e.*, mean) U.S. price to a particular purchaser, region, or time period (*i.e.*, the test group) and the weighted-average U.S. price to all other purchasers, regions, or time periods (i.e., the comparison group) is measured relative to the variance of the

U.S. prices within each of these groups (i.e., all U.S. prices)." *Id.* Commerce uses the "differential pricing analysis to examine all U.S. sales," and because of that, "where the sale prices in the test group and in the comparison group each represent the *full* population of prices to each of those groups for the comparable merchandise," it "render{s} inapposite concerns regarding the statistical significance of differences whether based on sample size or sample distribution." *Id.* (alteration and emphasis added). Thus, Commerce's use of the Cohen's *d* test is in accordance with law and a reasonable interpretation of the statute.

> ### 2. *Stupp* Did Not Invalidate Commerce's Lawful Use Of The Cohen's *d* Test

HiSteel's arguments rest heavily on the recent decision in *Stupp*. That decision, however, did not find invalidate or find unlawful Commerce's use of Cohen's d test *per se*. Rather, in *Stupp*, the Federal Circuit merely remanded the underlying redetermination "to give Commerce an opportunity to explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's d test in less-than-fair-value adjudications." 5 F.4th at 1360. "In that regard, {the Federal Circuit} invite{d} Commerce to clarify its argument that having the *entire* universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test." *Id*. (emphasis added). Importantly, the Federal Circuit did *not* hold Commerce's use of the Cohen's *d* test unlawful because in *Stupp*, Commerce had not addressed the statistical criteria which plaintiff claimed must be satisfied. *Id.* We note that the *Stupp* litigation is ongoing, with oral argument for the final redetermination on remand scheduled for January 23, 2023 *See* Order, *Stupp Corp. v. United States*, No. 15-334 (Ct. Int'l Trade Dec. 8, 2022), ECF No. 252. Thus, this Court has not

yet reached a final judgment regarding Commerce's use of the Cohen's *d* test, and Commerce's use of the Cohen's *d* test therefore remains lawful.

**3.      HiSteel Improperly Cites Untimely New Factual Information Which Was Not Before Commerce**

Throughout its argument concerning the Cohen's *d* test, HiSteel refers to academic texts that are not on the record of this review.  Pl. Br. at 5-7.  For example, HiSteel claims that the Cohen's *d* test can only be used in limited circumstances in which there is a normal distribution and that the limitations apply for populations as well as samples but cites to non-record information.  *Id.* at 5-6.  The academic literature on which HiSteel relies, however, is absent from this record, and  is factual information that Commerce never had the opportunity to consider.  *See Tri Union Frozen Prod., Inc. v. United States*, 163 F. Supp. 3d 1255, 1290 (Ct. Int'l Trade 2016) (finding that academic literature was "factual information" that was required to be timely placed on the record before Commerce).  In contrast, in *Stupp*, certain academic literature was timely placed on the record.  5 F.4th at 1359.  Because the cited academic literature is not on the record of this review, the Court should thus decline to consider it and the arguments that HiSteel makes based upon this information.

Here, Commerce based its final results on the record of the review.  HiSteel had the opportunity to place this information on the record in accordance with Commerce's deadlines but did not do so.  *See* 19 C.F.R. § 351.301(b)(2).  HiSteel cannot now circumvent the process of building an administrative record by presenting the academic literature to this Court, rather than Commerce.  *See Tri Union Frozen Prod.*, 163 F. Supp. 3d at 1290.  Particularly given the "complex {and} fact-specific" nature of the Cohens *d* test, it is inappropriate to allow HiSteel to present these materials and arguments to the Court without the benefit of the agency's evaluation and expertise.  *Carpenter Tech. Corp. v. United States*, 452 F. Supp. 2d 1344, 1346 (Ct. Int'l

Trade 2006) (finding that there was no exception to the exhaustion requirement, particularly given the nature of collapsing as an issue). Indeed, Commerce explained in the final results that DOSCO and HiSteel's "claim that the fact a sample is not used is irrelevant because normality is not based upon sampling," was not supported by record evidence. IDM at 20. Consequently, the Court should decline to consider the academic literature HiSteel cites in its brief because that was not on the administrative record before Commerce, and neither Commerce nor the other interested parties had the opportunity to consider these texts while conducting its administrative review. *See id.*

### 4. The Requirements For Statistical Significance Does Not Affect Commerce's Use Of The Cohen's *d* Test For Practical Significance

HiSteel argues that Dr. Cohen's cutoffs could only be used when samples are drawn from normal populations, the samples do not have unequal variance, and the groups of data are not small. Pl. Br. at 5-13. However, these arguments do not render Commerce's use of the Cohen's *d* test unlawful or unreasonable, as we explain below.

As an initial matter, Commerce analyzes the full population of U.S. sales for the Cohen's *d* test and does not use a sample of U.S. sales to estimate parameter values for the full population, IDM at 19. Thus, HiSteel's claims regarding sample size are not applicable in addition to being unsupported. *See* Pl. Br. at 5-13. In *Certain Oil Country Tubular Goods from the Republic of Korea*, 82 Fed. Reg. 18,105 (Dep't of Commerce Apr. 17, 2017), and the accompanying IDM at 22, Commerce explained that such claims concern "the statistical significance of the difference in the means for two sampled sets of data," and are not relevant "when considering whether this difference has a practical difference." *See also* IDM at 19.

Additionally, HiSteel's reliance on *Stupp* is misplaced. Importantly, and as explained above, the Federal Circuit did not find Commerce's use of the Cohen's *d* test unlawful, but

instead, remanded that particular proceeding for further explanation, which is not yet final. *Stupp*, 5 F.4th at 1360; IDM at 20. Further, the statistical criteria discussed in *Stupp* are not relevant in this administrative review because Commerce's Cohen's *d* test is in this review is based on the *full* universe of respondents' U.S. sales data. IDM at 20 (explaining that Commerce used "the differential pricing analysis to examine *all* U.S. sales") (emphasis added).

To wit, Commerce uses the Cohen's *d* test to measure the practical significance of difference in the means when using the entire population of data, rather than samples. The assumptions that concerned the Federal Circuit in *Stupp* relate to measuring the statistical significance of the difference in the means when using data (*i.e.*, in the test and comparison groups) that have been *sampled* from larger populations of sale prices. *Id.* at 19-20. Such was not the case here. As explained above, the Cohen's *d* coefficient, as a measure of effect size, determines whether the observed price differences are significant. *Id.* at 20. In this application, the difference in the weighted-average (*i.e.*, mean) U.S. price to a particular purchaser, region, or time period (*i.e.*, the test group) and the weighted-average U.S. price to all other purchasers, regions, or time periods (*i.e.*, the comparison group) is measured relative to the variance of the U.S. prices within each of these groups (*i.e.*, all U.S. prices). *Id.* Commerce used the differential pricing analysis to examine all U.S. sales, rendering inapposite concerns regarding the statistical significance of differences whether based on sample size or the type of sample distribution. *Id.*

As for the large, 0.8, threshold used by Commerce to determine that the Cohen's *d* test finds that the price differences are significant, the Federal Circuit has held that this threshold is reasonable. *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673 (Fed. Cir. 2019) ("The Trade Court described Commerce's rationale for adhering to the 0.8 line and explained why that rationale is reasonable . . . . We agree with the Trade Court that this rationale

adequately supports Commerce's exercise of the wide discretion left to it under 19 U.S.C.

§ 1677f-1(d)(1)(B).") (citation omitted).

Therefore, in the absence of any Congressionally-mandated procedure or methodology,

"Commerce 'may perform its duties in the way it believes most suitable.'" *JBF RAK LLC*, 790

F.3d at 1363 (citation omitted).  Commerce's methodology is reasonable and consistent with

statutory purpose and should be sustained.

## III.   Substantial Evidence Supports Commerce's Adjustment To Slitting Services

Substantial evidence supports Commerce adjustment to slitting services because record

evidence demonstrated that HiSteel's affiliate, Hanil, provided services pertained to slitting.

IDM at 56.  As a result, Commerce used the overall average price of slitting services when it

applied the transactions disregarded rule.  *Id.*

As a general matter, Commerce determines whether subject merchandise is being sold at

less than fair value by comparing a respondent's U.S. price with normal value.  *See* 19 U.S.C.

§ 1677b.  When a respondent does not have a viable home market or third country market to

serve as the basis for normal value, Commerce uses constructed value as the basis for normal

value pursuant to 19 U.S.C. § 1677b(a)(4).  The antidumping statute provides special rules for

the calculation of cost of production and constructed value.  *See* 19 U.S.C. § 1677b(f).

In particular, the statute provides the transactions disregarded rule for addressing transactions

between affiliated parties.  The transactions disregarded rule states:

> A transaction directly or indirectly between affiliated persons may be
> disregarded if, in the case of any element of value required to be considered,
> the amount representing that element does not fairly reflect the amount
> usually reflected in sales of merchandise under consideration in the *market
> under consideration*.  If a transaction is disregarded under the preceding
> sentence and no other transactions are available for consideration, the
> determination of the amount shall be based on the information available as

> to what the amount would have been if the transaction had occurred between
> persons who are not affiliated.

*Id.* § 1677b(f)(2) (emphasis added).  Consistent with section 1677b(f)(2), Commerce compares

the transfer prices for the inputs charged by affiliated suppliers to the market price for the same

input, and if the price between the affiliated parties is below the market price, Commerce may

make an adjustment to reflect the market price.  *See, e.g.*, *Polyethylene Retail Carrier Bags from*

*Thailand*, 72 Fed. Reg. 1,982 (Dep't of Commerce Jan. 17, 2007), and accompanying IDM at

cmt. 5; *Certain Oil Country Tubular Goods from Mexico*, 71 Fed. Reg. 54,614 (Dep't of

Commerce Sept. 18, 2006), and accompanying IDM at cmt. 5.

To establish the market price, Commerce typically looks at the price between unaffiliated

parties for the input.  *Id.*  Commerce has discretion as to how it applies the transactions

disregarded rule.  *SKF USA, Inc. v. United States*, 116 F. Supp. 2d 1257, 1267 (Ct. Int'l Trade

2000) (holding that the statutory construction of sections 19 U.S.C. § 1677b(f)(2) and (3) gives

Commerce discretion as to how it applies the major input rule and transactions disregarded rule).

HiSteel argues that Commerce ignored its practice because the record demonstrates that

identical rates are charged to affiliated and unaffiliated parties for the same service, and that is

sufficient to establish that the affiliated party transaction was at arm's length, thus negating the

need for application of the transactions disregarded rule.  *See* Pl. Br. at 15.  HiSteel also argues

that Commerce diverged from its practice of comparing transactions with affiliated suppliers at

the level of detail for which market prices are available on the record, and that, in any event,

record evidence demonstrates that the slitting services that its affiliated supplier, Hanil, provided

to unaffiliated customers were not identical to the slitting services it provided to HiSteel during

the review period.  *Id.* at 16-17.  Finally, HiSteel claims that Commerce's averaging creates an

artificial price difference.  *Id.* at 17.  These arguments are without merit, as we explain below.

16

Here, Commerce did not diverge from its practice when it compared the average price of slitting services from Hanil to HiSteel with the average prices of slitting services from Hanil to unaffiliated parties.  *See* IDM at 56.  As Commerce explained in the final results, the schedule that HiSteel had submitted "purported to show that HiSteel and unaffiliated suppliers were subject to the same prices that varied based on the nature of the service performed for slitting services."  *Id.*  Commerce explained that it was not persuaded by the price schedule because it did not necessarily demonstrate that ████████████████████████████████████

████████████████████] were the basis for the prices charged to Hanil's customers; however, the price schedule did indicate that all the services provided by Hanil pertained to slitting.  *See* IDM at 56; HiSteel Section D Response (Jan. 25, 2021) at Exhibit D-3-B (P.R. 47, C.R. 20).

Rather, Commerce noted that "{b}ecause all of the service provided by Hanil pertain to slitting," it "disagree{d} with HiSteel that {its} analysis should focus on individual slitting services rather than the overall average price of slitting services."  IDM at 56.  Thus, Commerce determined to calculate its transactions-disregarded adjustment "by comparing the overall average price charged by Hanil to HiSteel for slitting services and the overall average price charged by Hanil to unaffiliated customers."  *Id.*  Consequently, Commerce used the overall average price of slitting services.

Although HiSteel cites *Circular Welded Non-Alloy Steel Pipe from Korea*, 63 Fed. Reg. 32833 (Dep't of Commerce June 16, 1998), and accompanying IDM at Comment 19, that proceeding involved a respondent that *did* demonstrate that the fee schedule correlated with destination codes and this distance was a factor in setting the rates.  But here, HiSteel did not do so.  Moreover, because the all of the services pertained to the slitting services, the price

differences are not artificial, but rather, an appropriate use of the transactions disregarded rule in which Commerce uses the arm's-length test and detects differences in price between transactions between affiliated parties and transactions between unaffiliated ones. *See* IDM at 56. Moreover, Commerce's application of transactions disregarded to slitting services is consistent with its practice in previous administrative reviews of this order. *See, e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, 86 Fed. Reg. 35,060 (Dep't of Commerce July 1, 2021), and accompanying IDM at Comment 15. Therefore, the Court should sustain Commerce's application of the transactions disregarded rule to the slitting services of HiSteel's affiliate.

**IV.    Substantial Evidence Supports Commerce's Adjustment To The Scrap Offset**

Commerce's adjustment to the scrap offset was reasonable and supported by substantial evidence because the record does not demonstrate that skelp scrap and pipe scrap have sufficiently different physical properties. *See* IDM at 57. Although Commerce granted the scrap offset, HiSteel argues that Commerce incorrectly calculated that offset, because the record allegedly does not support combining pipe scrap and skelp scrap. Pl. Br. at 19-21. This argument is meritless.

Commerce grants offsets to normal value "for sales of byproducts generated during the production of subject merchandise, if the respondent can demonstrate that the byproduct is either resold or has commercial value and re-enters the respondent's production process." *Arch Chems., Inc. v. United States*, 33 C.I.T. 954, 956 (2009). The evidentiary burden is on the respondent and the respondent must "substantiate by-product offsets by providing {Commerce} with sufficient information to support its claims." *Id.*; 19 C.F.R. § 351.401(b)(1)-(2). This is because Commerce must determine whether the respondent's production process *actually*

18

*generated* the amount of scrap claimed as a byproduct offset. *See Am. Tubular Prod., LLC v. United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017) ("as Commerce explained, Chengde failed to present any evidence to show either that the production of OCTG, the subject merchandise, actually generated the scrap sold, or that the scrap sold was indeed produced during the period of review."). "Absent evidence linking the scrap sold with any scrap generated resulting from the production of {the subject merchandise} during the period of review," then Commerce can determine that the "submissions were insufficient and properly" deny the requested offset. *Id.* The offset amount is then limited to the total byproduct production quantity. *Juancheng Kangtai Chem. Co. v. United States*, No. 14-00056, 2015 WL 4999467, at *40 (Ct. Int'l Trade Aug. 21, 2015) ("Commerce has described its normal by-product offset practice as limited to the total production quantity of the by-product . . . produced during the {period of review}, so long as it is shown that the byproduct has commercial value.") (quotation omitted). Thus, the burden is on HiSteel to demonstrate entitlement for a particular adjustment.

In the final results, Commerce explained that "record evidence does not indicate that the two scrap types have different physical properties." IDM at 57. The portions of the record that HiSteel cites does not demonstrate that the physical properties of the scrap types are so different that they cannot be combined. *See* Pl. Br. at 20 (citing HiSteel Section D Response at 4). For example, the narrative response generally describes when the skelp scrap and pipe scrap are created, but does not describe how the physical properties differ, as HiSteel articulates to greater extent for the first time in its brief. Moreover, HiSteel did not exhaust this particular argument in its case brief during the administrative proceeding. 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of

19

publication of the preliminary determination or preliminary results."); *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (recognizing that the exhaustion requirement protects administrative agency authority and promotes judicial efficiency). Indeed, a party's obligation to exhaust its administrative remedies in proceedings before Commerce applies both to broad issues and arguments related to those issues. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (disagreeing with contention that courts can consider new arguments so long as the general issue was raised at the agency level); *Paul Muller Industrie GmbH & Co. v. United States,* 502 F. Supp. 2d 1271, 1275 (Ct. Int'l Trade 2007) (holding that when a party raises a general issue, but fails to incorporate a specific argument among other arguments that relate to the same issue, it fails to exhaust administrative remedies with respect to that argument). Exceptions to the exhaustion requirement are limited, [1] as such the Court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases," *Corus Staal BV*, 502 F.3d at 1379, and none of the exceptions to exhaustion apply here. Therefore, this Court should decline to entertain HiSteel's arguments concerning the different physical qualities of skelp scrap and pipe scrap.

HiSteel also relies on the fact that skelp scrap has a lower per-unit price than pipe scrap, Pl. Br. at 20, but price is not necessarily indicative of different physical properties, as other factors may affect price in addition to physical properties. *Cf. Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1330 (Ct. Int'l Trade 2015) ("differences in costs do not constitute

---

[1] None of the exceptions to the exhaustion requirement are applicable here, which include futility, pure question of law, lack of timely access to the confidential record, no administrative procedure to exhaust, or new interpretation from an intervening judicial decision. *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013).

differences in products in and of themselves"). And while HiSteel contends that Commerce should not have used the review period average of the scrap, and instead, should have compared a single sale to Hanil to only one month of unaffiliated sales, Pl. Br. at 21-23, Commerce's "practice is to use {period of review} average to {period of review} average." IDM at 57. HiSteel argues that this practice is only applicable to purchases by the respondent from an affiliated supplier rather than sales by the respondent to an affiliated customer. Pl. Br. at 22-23. HiSteel cites no authority, nor are we aware of any, to support its claim that Commerce must use a different practice when applying the transactions disregarded rule for sales by the respondent to an affiliated customer.

Additionally, HiSteel claims that the prices set were identical. Pl. Br. at 23. However, Commerce explained that "the record evidence demonstrates on a test basis that HiSteel's sales of scrap to unaffiliated parties were made on different sales terms than its sales of scrap to its affiliate." IDM at 57. Moreover, Commerce accounted for the fact that the sales of scrap to unaffiliated parties were made on an ███████ basis, whereas the sale to Hanil was made on a ████████ basis and ██████████████ from the price of scrap sold to Hanil before testing the prices to determine whether they were at arm's length, finding that the price charged to Hanil was ████████████ HiSteel Calculation Memorandum at 2 (Apr. 1, 2022) (P.R. 242, C.R. 229).

Finally, Commerce had requested HiSteel to separately report the skelp scrap and pipe scrap because doing so enabled easier review of the cost buildups and its separate reporting does not indicate that Commerce viewed the physical properties as different. Pl. Br. at 21. The Court should decline to consider this argument because HiSteel failed to raise this argument before Commerce, and no exceptions to exhaustion apply. *See Corus Staal BV*, 502 F.3d at 1379.

21

# CONCLUSION

For these reasons, we respectfully request that this Court sustain the final results in their entirety and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/Tara K. Hogan for Claudia Burke
CLAUDIA BURKE
Assistant Director

| | |
|---|---|
| OF COUNSEL: | s/Kara M. Westercamp |
| VANIA WANG | KARA M. WESTERCAMP |
| Attorney | Trial Attorney |
| Department of Commerce | U.S. Department of Justice |
| Office of the Chief Counsel | Civil Division |
|   for Trade Enforcement & Compliance | Commercial Litigation Branch |
| | P.O. Box 480 |
| | Ben Franklin Station |
| | Washington, D.C.  20044 |
| | Tel: (202) 305-7571 |
| December 21, 2022 | Attorneys for Defendant |

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 6,318 words, including text, footnotes, and headings.

<u>/s/Kara M. Westercamp</u>

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE
_____
                                                    )
HISTEEL CO., LTD,                                   )
                                                    )
                    Plaintiff,                      )
                                                    )
        and                                         )
                                                    )
DONG-A-STEEL CO., LTD,                              )
                                                    )
                    Plaintiff-Intervenor,           )
                                                    )
        v.                                          )        Court No. 22-00142
                                                    )
UNITED STATES,                                      )
                                                    )
                    Defendant,                      )
                                                    )
        and                                         )
                                                    )
NUCOR TUBULAR PRODUCTS INC.,                        )
                                                    )
                    Defendant-Intervenor.           )
_____)

## ORDER

Upon consideration of the motion for judgment upon the administrative record filed by

plaintiff and plaintiff-intervenor, responses thereto, plaintiff's reply, the administrative record,

and all other pertinent papers, it is hereby

ORDERED that plaintiff's and plaintiff-intervenor's motions are DENIED;

ORDERED that the Department of Commerce's determination is affirmed in all respects; and it is further

ORDERED that judgment is entered in favor of the United States.

_____
JUDGE

Dated: _____