**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| HISTEEL CO., LTD., |
| Plaintiff, |
| and |
| DONG-A-STEEL CO., LTD., |
| Plaintiff-Intervenor, |
| v. |
| UNITED STATES, |
| Defendant, |
| and, |
| NUCOR TUBULAR PRODUCTS INC., |
| Defendant-Intervenor. |

Before: Hon. Gary S. Katzmann,
Judge

Court No. 22-00142

<u>**NOTICE OF SUPPLEMENTAL AUTHORITY AND
MOTION TO STAY PROCEEDINGS**</u>

On behalf of Defendant-Intervenor Nucor Tubular Products Inc. ("Nucor Tubular"), we hereby submit this Notice of Supplemental Authority.  Provided as **Attachment 1** is the final decision in *Stupp Corp. v. United States*, Ct. No. 15-00334, slip. op. 23-23 (Ct. Int'l Trade Feb. 24, 2023) ("*Stupp IV*"), which is the final decision of the Court of International Trade after remand from the Federal Circuit in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Circ. 2021) ("*Stupp III*").  *Stupp IV* holds that the third remand determination of the U.S. Department of Commerce ("Commerce") in that case has sufficiently addressed the Federal Circuit's concerns articulated in *Stupp III* regarding the Cohen's *d* test.  *Stupp IV* is relevant to this Court's analysis because the issues in *Stupp IV* are identical to the primary issue in this case.

Pursuant to Court of International Trade Rule 7(b), Nucor Tubular respectfully moves the Court to stay all proceedings in this case pending the expiration of the deadline to appeal *Stupp IV*

Court No. 22-00142

under the Federal Rules.  *Stupp IV* is ripe for appeal and the final disposition will have a direct impact on the issues before this Court.  In particular, the issues in *Stupp IV* are virtually identical to the issues in this case, and any appeal of *Stupp IV* will ultimately dictate the outcome of this case.  Absent a motion under Rule 4(a)(4) of the Federal Rules of Appellate Procedure, parties in *Stupp IV* have until April 25, 2023 to file a notice of appeal to the Federal Circuit.  Once this deadline has passed, or a notice of appeal has been filed, this Court will be better equipped to determine the best way forward in this case: Whether to proceed with the litigation, or to stay the litigation pending a ruling from the Federal Circuit.  Nucor Tubular requests this stay in the interests of judicial economy and conserving the parties' resources, and represents that a stay will not work undue harm or prejudice.

The case before the Court is an appeal from Commerce's final determination in the fourth administrative review of the antidumping duty order on *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 87 Fed. Reg. 20,390 (Dep't Commerce Apr. 7, 2022) (final results of antidumping duty admin. rev.; 2019–2020).  The primary issue in this appeal relates to Commerce's use of the Cohen's *d* test as part of the differential pricing analysis.  Since the Federal Circuit decided *Stupp III*, the same issue has arisen in a number of appeals before this Court.  Given the advanced status of the *Stupp* litigation, and the dispositive nature of any appeal of *Stupp IV* to the central issue in this proceeding, Nucor Tubular requests a stay of these proceedings until at least the deadline for filing a notice of appeal in *Stupp IV* has passed.

"{T}he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  This Court has frequently found a stay especially appropriate where the outcome of another appeal will bear upon

the issues in the case.  *See, e.g.*, *SKF USA, Inc. v. United States*, 36 CIT 842, 844 (2012) (finding

a stay would "serve the interest of judicial economy and conserve the resources of the parties"

where multiple cases raised the same general issue and "the pending litigation in the Court of

Appeals is likely to affect the disposition of plaintiffs' claim"); *RHI Refractories Liaoning Co.,*

*Ltd. v. United States*, 35 CIT 407, 411, 774 F. Supp. 2d 1280, 1285 (2011) (finding "conditions

favor{ed} a stay pending a final decision by the Federal Circuit," including "promot{ing} judicial

economy and preserv{ing} the resources of the parties and the court"); *An Giang Agric. & Food*

*Imp. Exp. Co. v. United States*, 28 CIT 1671, 1675–76, 350 F. Supp. 2d 1162, 1166 (2004) (finding

that, if "the effect of a stay might be to narrow and sharpen the issues" in the stayed action, "that

point counsels entry . . . of the stay").

      For the same reasons, and consistent with this Court's precedents, good cause exists to stay

this proceeding.  Regardless of outcome, the final resolution of *Stupp IV* will necessarily bear on

the issues in this appeal.  If *Stupp IV* is affirmed by the Federal Circuit, this appeal will be

effectively mooted.  If *Stupp IV* is overturned by the Federal Circuit, the Court's ultimate resolution

of this appeal will need to take the Federal Circuit's decision into account.  *Cf. RHI Refractories*,

35 CIT at 411, 774 F. Supp. 2d at 1285 (noting a stay is warranted where an impending Federal

Circuit decision has the potential to "metamorphose any intermediate decision of this court into a

superfluous moot opinion, or at the very least complicate any appeal from this court").  If no appeal

of *Stupp IV* is filed, then *Stupp IV* at a minimum becomes persuasive authority for this Court on

an identical issue.  Good cause thus exists for a stay until at least the expiration of the deadline to

file a notice of appeal of *Stupp IV*.

      The requested stay will not impose hardship or inequity to other parties.  To the contrary,

a stay will necessarily narrow—if not altogether resolve—the issues in this appeal, protecting all

Court No. 22-00142

involved from the needless expenditure of time and resources.  And the requested stay is of limited duration.  Absent a motion under Rule 4(a)(4) of the Federal Rules of Appellate Procedure, parties in *Stupp IV* have until April 25, 2023 to file a notice of appeal to the Federal Circuit.  *Cf. Jiaxing Brother Fastener Co. v. United States*, 179 F. Supp. 3d 1156, 1160 (Ct. Int'l Trade 2016) (finding a stay of limited duration "can be expected to sharpen the issues here and to streamline these proceedings (and thus will help conserve the resources of all concerned)—and, indeed, conceivably may result in the dismissal of one or more" claims).  Therefore, in the interests of judicial economy, Nucor Tubular respectfully requests this Court stay oral argument and any other proceedings until after the deadline to file a notice of appeal of *Stupp IV*.

Nucor Tubular has consulted with the parties to this proceeding regarding this motion. On March 7, 2023, counsel for Defendant the United States, Kara Westercamp of the U.S. Department of Justice, indicated that the Government defers to the Court on whether to stay proceedings pending the final resolution of *Stupp*.  But the Government respectfully suggests argument should be deferred until after the *Stupp* appeal period runs.  On March 9, 2023 counsel for Plaintiff HiSteel Co., Ltd. and Plaintiff-Intervenor Dong-A-Steel Co., Ltd. Amrietha Nellan of Winton & Chapman PLLC, indicated via email that Plaintiff and Plaintiff-Intervenor do not object to bringing any decisions to the attention of the Court, but believe that *Stupp IV* does not address "identical concerns" to the case presently before the Court for reasons Plaintiff and Plaintiff-Intervenor intend to set forth in response to Defendant-Intervenor's motion.  Furthermore, Plaintiff and Plaintiff-Intervenor do not agree to a stay of oral argument or decision in this proceeding since this

Court No. 22-00142

Court is not bound by the decision of Judge Kelly in *Stupp IV*, whether or not that decision is appealed.

<p style="text-align:center">*       *       *</p>

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Jake R. Frischknecht, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20006
(202) 719-7000

</div>

Dated: March 9, 2023                          *Counsel to Nucor Tubular Products Inc.*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

HISTEEL CO., LTD.,

               **Plaintiff,**

     **and**

DONG-A-STEEL CO., LTD.,

               **Plaintiff-Intervenor,**

     **v.**

UNITED STATES,

               **Defendant,**

     **and,**

NUCOR TUBULAR PRODUCTS INC.,

               **Defendant-Intervenor.**

**Before: Hon. Gary S. Katzmann,**
**Judge**

**Court No. 22-00142**

## ORDER

Upon consideration of Nucor Tubular Products Inc.'s ("Nucor Tubular") motion to stay this action, it is hereby

**ORDERED** that Nucor Tubular's motion is granted; and it is further

**ORDERED** that 14 days after the deadline established by the Federal Rules of Appellate Procedure for filing a notice of appeal of *Stupp Corp., v. United States,* Ct. No. 15-00334, slip. op. 23-23 (Ct. Int'l Trade Feb. 24, 2023), the parties will file comments on how the developments in the *Stupp* litigation should affect this case. Rebuttal comments may be filed within 14 days of the deadline for comments.

**SO ORDERED.**

_____
Hon. Gary S. Katzmann, Judge

Dated: _____, 2023
     New York, New York

# ATTACHMENT 1

Slip Op. 23-23

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **STUPP CORPORATION ET AL.,** | |
| **Plaintiffs and Consolidated Plaintiffs,** | |
| **and** | |
| **MAVERICK TUBE CORPORATION,** | |
| **Plaintiff-Intervenor and Consolidated Plaintiff-Intervenor,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 15-00334** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **SEAH STEEL CORPORATION AND HYUNDAI STEEL COMPANY,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

## <u>OPINION AND ORDER</u>

[Sustaining the U.S. Department of Commerce's third remand redetermination in the less-than-fair-value investigation of welded line pipe from the Republic of Korea.]

Dated: February 24, 2023

<u>Jeffrey M. Winton</u> and <u>Jooyoun Jeong</u>, Winton and Chapman PLLC, of Washington, D.C., argued for plaintiff SeAH Steel Corporation.

Robert R. Kiepura, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were Claudia Burke, Assistant Director, Patricia M. McCarthy, Director, and Brian M. Boynton, Principle Deputy Assistant Attorney General.  Of Counsel was Mykhaylo Gryzlov, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Jeffrey D. Gerrish, Schagrin Associates, of Washington, D.C., argued for plaintiff Welspun Tubular LLC USA.  With him on the brief were Roger B. Schagrin and Saad Y. Chalchal.

Kelly, Judge: Before the court is the U.S. Department of Commerce's ("Commerce") third remand redetermination in its 2015 less-than-fair-value investigation of welded line pipe imported from the Republic of Korea ("Korea").  See Final Results of Redetermination Purs. Ct. Remand, April 4, 2022, ECF No. 208 ("Remand Results"); see also Welded Line Pipe From [Korea], 80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) (final determination of sales at less than fair value), as amended by Welded Line Pipe From [Korea], 80 Fed. Reg. 69,637 (Dep't Commerce Nov. 10, 2015) ("Amended Final Determination") and accompanying Issues & Decisions Memo, A-580-876, (Oct. 5, 2015), ECF No. 30-3 ("Final Decision Memo"). In Stupp Corporation v. United States, the Court of Appeals for the Federal Circuit vacated this court's opinion, remanding to Commerce to further explain why it is reasonable to apply the Cohen's $d$ test as part of its differential pricing analysis if certain statistical assumptions have not been met. Stupp Corporation v. United States, 5 F.4th 1341 (Fed. Cir. 2021) ("Stupp III").  For the following reasons, the court sustains Commerce's third remand redetermination.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in this court's previous opinions, as well as the Court of Appeals' decision in <u>Stupp III</u>, and now recounts only the facts relevant to the court's review of the Remand Results.  On November 14, 2014, Commerce initiated an antidumping duty investigation of welded line pipe from Korea.  Welded Line Pipe From [Korea], 79 Fed. Reg. 68,213, 68,213 (Dep't Commerce Nov. 14, 2014) (initiation of less-than-fair-value investigation).  Commerce published its final determination on October 5, 2015 and, finding that 39.72% of SeAH Steel Corporation's ("SeAH") U.S. sales passed the Cohen's $d$ test, applied the average-to-transaction method to those sales.  Final Decision Memo. at 4.  Commerce accordingly calculated a 2.53% dumping margin for SeAH.  <u>Amended Final Determination</u> at 69,638.  SeAH appealed, arguing that Commerce's differential pricing analysis and application of the Cohen's $d$ test were contrary to law and unsupported by substantial evidence.  <u>See</u> <u>Stupp Corp. v. United States</u>, 359 F. Supp. 3d 1293, 1302 (Ct. Int'l Tr. 2019) ("<u>Stupp I</u>"), reconsideration denied, 365 F. Supp. 3d 1373 (Ct. Int'l Tr. 2019).  SeAH also argued that Commerce improperly rejected its case brief, which contained citations to certain academic texts not part of the administrative record.  <u>Id.</u> at 1300–03; Letter from Commerce Rejecting SeAH's Sept. 1, 2015 Case Br., 1–2, PD 384, bar code 3302027-01 (Sept. 3, 2015); [SeAH's] Case Br., PD 377–79, bar codes 3301610-01–03 (Sept. 1, 2015) ("SeAH's Rejected Brief").

This court sustained Commerce's determinations with respect to its use of differential pricing analysis and rejection of SeAH's case brief. <u>Stupp I</u>, 359 F. Supp. 3d at 1299–1306. Specifically, the court found that Commerce correctly rejected SeAH's brief because the academic authorities cited in the brief constituted new factual information intended to advance SeAH's arguments. <u>Id.</u> at 1301. The court also found that Commerce's differential pricing analysis was supported by substantial evidence because, among other reasons, Commerce was not required to apply the Cohen's $d$ test in accordance with academic literature. <u>Id.</u> at 1302–06.

The Court of Appeals remanded, instructing Commerce to further explain why its use of the Cohen's $d$ test was reasonable in light of "significant concerns" related to application of the test. <u>Stupp III</u>, 5 F. 4th at 1357. Specifically, the Court of Appeals questioned the reasonableness of Commerce's application of Cohen's $d$ test to data failing to satisfy the statistical criteria of normality, equal variance, and sufficient observation size. <u>Id.</u> 1357–60. Citing to academic literature examining the use of Cohen's $d$ test to measure effect size, the Court of Appeals expressed concern that Commerce's failure to satisfy the statistical criteria assumed by Cohen's test could "undermine the usefulness of the interpretive cutoffs," resulting in artificially inflated dumping margins. <u>Id.</u> at 1357. The Court of Appeals affirmed the remaining issues from <u>Stupp I,</u> including this court's decision to uphold Commerce's rejection of SeAH's case brief. <u>Id.</u> at 1344.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to  28 U.S.C. § 1581(c) (2018), which grants the court authority to review actions initiated under 19 U.S.C. § 1516a(a)(2)(B)(i)[1] contesting the final determination in an antidumping duty order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  <u>Xinjiamei Furniture Co. v. United States</u>, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Tr. 2014).

## DISCUSSION

On remand, SeAH challenges Commerce's application of the Cohen's *d* test on the grounds that (1) assumptions underlying the test have not been met, (2) the large cutoff prescribed by the test is arbitrary, and (3) random variables such as exchange rates can cause "false positives."  <u>See</u> Cmts. of [SeAH] on Final Determ. on Remand, 5–36, June 14, 2022, ECF No. 216 ("SeAH's Cmts.").  Defendant and Welspun Tubular LLC ("Welspun") counter that (1) the assumptions are inapplicable, (2) Commerce's application of Cohen's *d* test leads to reasonable results, (3) the cutoff is supported by statistical literature, (4) SeAH cannot introduce non-record documents for the first time on remand, and (5) SeAH failed to exhaust administrative remedies for its

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

Consol. Court No. 15-00334                                                    Page 6

exchange rate-related arguments.  See Def.'s Corr. Resp. to Cmts., 9–34, Sept. 22,

2022, ECF No. 230 ("Def.'s Reply"); [Welspun's] Reply [SeAH's] Cmts. on Remand

Redeterm., 18–32, Aug. 15, 2022, ECF No. 218 ("Welspun's Reply").  For the following

reasons, the court sustains the results of Commerce's remand redetermination.

## I.  SeAH's Non-Record Documents

SeAH's comments to the Remand Results reference several pieces of academic

literature which were not included in the administrative record.  See SeAH's Cmts.

at 6–36.  Welspun and Defendant argue that the court should disregard these

materials, as judicial review is limited to the agency record.  Welspun's Reply at 19–

20; Def.'s Reply at 10–12.  SeAH argues that the court may take judicial notice, or

otherwise consider, these materials to better understand the statistical principles

behind Cohen's $d$ test.  Reply of [SeAH] to Responses by Def. and [Welspun], 10–11,

Sept. 28, 2022, ECF No. 236 ("SeAH's Reply").  For the following reasons, the court

need not take judicial notice of SeAH's non-record documents to understand the

statistical principles they illustrate.

Judicial review is generally limited to the administrative record before the

agency at the time it rendered its decision.  See Camp v. Pitts, 411 U.S. 138, 142

(1973).  "The purpose of limiting review to the record actually before the agency is to

guard against courts using new evidence to 'convert the "arbitrary and capricious"

standard into effectively de novo review.'"  Axiom Res. Mgmt., Inc. v. United States,

Consol. Court No. 15-00334                                          Page 7

564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting <u>Murakami v. United States</u>, 46 Fed. Cl.

731, 735 (2000), <u>aff'd</u>, 398 F.3d 1342 (Fed. Cir. 2005)).

This court previously upheld Commerce's decision to reject SeAH's non-record

documents, on the grounds that the submissions constituted new factual information

not on the administrative record.  <u>Stupp I</u>, 359 F. Supp. 3d at 1299–1306.  SeAH's

submissions primarily cited academic articles relating to application of the Cohen's $d$

test under certain conditions.  SeAH's Rejected Brief at 26–33.  On appeal, the Court

of Appeals affirmed this court's decision rejecting the non-record information,

concluding that SeAH's materials were not introduced to correct inaccuracies in

Commerce's reporting, but to support its argument challenging Commerce's use of

Cohen's $d$ test.  <u>Stupp III</u>, 5 F.4th at 1350.  In <u>Stupp III</u>, the Court of Appeals

nevertheless referenced and quoted from several of the non-record texts introduced

by SeAH.[2]  <u>Id.</u> at 1357–59.  On remand, Commerce asked SeAH to place the

_____

[2] The Federal Circuit cited the following five works: Grissom, Robert and Kim, John, <u>Effect Sizes for Research: Univariate and Multivariate Applications</u> (2nd ed. 2012), A-580-876, PRRD 8, bar code 4181776-01 (Nov. 12, 2021) ("Grissom & Kim"); Coe, Robert, <u>It's the Effect Size Stupid: What Effect Size Is and Why It Is Important</u>, paper presented at the Annual Conference of the British Educational Research Association (September 2002), A-580-876, PRRD 8, bar code 4181776-01 (Nov. 12, 2021) ("Coe"); Lane, David, et al., <u>Introduction to Statistics</u>, Online Edition, A-580-876, PRRD 8, bar code 4181776-01 (Nov. 12, 2021) ("Lane"); Algina, James, Keselman, H.J., and Penfield, Randall, <u>An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case</u>, 10 Psychological Methods (2005), A-580-876, PRRD 8, bar code 4181776-01 (Nov. 12, 2021) ("Algina"); Li, Johnson Ching-Hong, <u>Effect Size Measures in a Two-Independent-Samples Case With Nonnormal and Nonhomogenous Data</u>, Behavioral Research (2015), A-580-876, PRRD 8, bar code 4181776-01 (Nov. 12, 2021) ("Li").

previously-rejected materials on the record, which SeAH did.  See Letter from

[Commerce] to Interested Parties, A-580-876, PRRD 1, bar code 4176823-01 (Oct. 29,

2021); SeAH Submission of Publications Requested, A-580-876, PRRD 8, bar code

4181776-01 (Nov. 12, 2021).  In its comments on the remand redetermination, SeAH

again cites new academic sources not on the record, arguing that the court may

consider the underlying statistical principles which the texts discuss.[3]  See SeAH's

Cmts. at 6–25.  SeAH claims that the Court of Appeals considered SeAH's previous

academic sources in Stupp III, despite upholding Commerce's rejection of SeAH's

brief which contained these materials.  SeAH's Reply at 10–11.  Although SeAH

states that the Court of Appeals took judicial notice of the texts, it later clarified that

the court may consider the statistical principles regardless of whether the texts

themselves are on the record.  Response of [SeAH] to Def's Sur-Reply, 2–3, Nov. 14,

2022, ECF No. 247 ("SeAH's Sur-Reply").[4]

---

[3] SeAH cites to the following six non-record sources in its comments: Todd D. Little, Oxford Handbook of Quantitative Methods in Psychology (2013); Ricca and Blaine, Notes on a Nonparametric Estimate of Effect Size, 90:1 Journal of Experimental Education 249 (2022); Hedges and Olkin, Overlap Between Treatment and Control Distributions as an Effect Size Measure in Experiments, 21:1 Psychological Methods 61 (2016); Huberty and Lohman, Group Overlap as a Basis for Effect Size, 60:4 Educational and Psychological Measurement 543 (2000); J. Cohen, A Power Primer, 112:1 Psychological Bulletin 155 (1992); F. Alvarez, A. Atkeson, and P. Kehoe, If Exchange Rates Are Random Walks, Then Almost Everything We Say about Monetary Policy is Wrong, Federal Reserve Bank Of Minneapolis Research Department Staff Report 388 (2007).

[4] SeAH argues that the Court of Appeals' decision "stands for the proposition that, when an agency purports to be using a statistical test in accordance with widely-adopted statistical practice, the courts may consider non-record academic materials to evaluate that claim."  SeAH's Sur-Reply at 2.

Consistent with the approach of the Court of Appeals, the court may recognize the basic statistical principles discussed in these texts. The idea, for example, that a skewed statistical sample may yield inaccurate results is inductive reasoning—not an assertion of fact. The Court of Appeals' references to academia do not render its reasoning dependent on academic sources. Thus, the court considers Commerce's Cohen's *d* methodology in the same way it would review any other methodology, and may make logical inferences without taking judicial notice of SeAH's literature.

## II.   Administrative Exhaustion

SeAH argues that random fluctuations of exchange rates can affect the Cohen's *d* test, and lead to inaccurate results. SeAH's Cmts. at 24–28. Welspun and Defendant argue SeAH failed to properly exhaust this argument. Welspun's Reply at 20–21; Def.'s Reply. at 27–28. For the following reasons, the court concludes that SeAH has exhausted this argument.

Pursuant to 28 U.S.C. § 2637(d), the court "shall, where appropriate, require the exhaustion of administrative remedies," including at the preliminary determination stage before the agency. 28 U.S.C. § 2637(d); 19 C.F.R § 351.309(c)(2). Section 2637(d) grants the court "discretion to identify circumstances where exhaustion of administrative remedies does not apply." ABB, Inc. v. United States, 920 F.3d 811, 818 (Fed. Cir. 2019) (quoting Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003)). The court may also excuse exhaustion in certain

Consol. Court No. 15-00334                                                      Page 10

circumstances, such as when a party is raising a "pure question of law." <u>Agro Dutch</u>
<u>Indus. Ltd. v. United States</u>, 508 F.3d 1024, 1029 (Fed. Cir. 2007).

In its comments on the draft redetermination, SeAH argued that random
factors, such as exchange rates, could cause the standard deviation of test populations
to vary significantly.  SeAH's Cmts. on Draft Redetermination, 17–20, A-580-876,
PRRD 30, bar code 4224356-02 (March 21, 2022).  SeAH did not provide an exchange
rate table, or assert that its actual sales during the period of review were affected by
these factors.  <u>See id.</u>  Subsequently, in its comments on the final remand results,
SeAH again argues that Cohen's $d$ could be significantly affected by random factors
where the population of data is not normally distributed.  SeAH's Cmts. at 24–28.
SeAH adds that its sales were, in fact, affected by fluctuations in the exchange rate
between the U.S. dollar and Korean won, because its inland freight expenses were
denominated in won.  <u>Id.</u> at 24.  Welspun counters that SeAH failed to raise its
exchange rate argument and supporting factual information during the draft
redetermination.  Welspun's Reply at 26.

SeAH has exhausted its exchange rate argument.  SeAH's exchange rate
examples provide an illustration of how it believes random factors can render the
Cohen's $d$ test inaccurate when values are not normally distributed.  Normal
distributions is one of the three assumptions that the Court of Appeals remanded to
Commerce to explain.  <u>See</u> <u>Stupp III</u>, 5 F. 4th at 1360.  Therefore, Welspun's argument
that Commerce had no opportunity to address SeAH's exchange rate calculations

Consol. Court No. 15-00334                                              Page 11

misses the point; these calculations are not a new argument, but an illustration of the same scenario Commerce was directed to explain.

SeAH separately argues Commerce must "ignore" fluctuations in exchange rates pursuant to 19 U.S.C. 1677b-1(a). SeAH's Br. at 8. SeAH concedes that it did not raise this argument in its comments to the draft remand results; nevertheless, it argues that this argument may be considered as a "pure question of law." Oral Argument at 0:27:39–0:27:53. Defendant argues that Commerce had no opportunity to consider this argument on remand, and Welspun characterizes the argument as a mixed question of law and fact. Oral Argument at 0:24:15–0:26:33, 0:27:56–0:28:39. Whether § 1677b-1(a) is pertinent to Commerce's differential pricing analysis is a matter of statutory interpretation, not subject to exhaustion requirements. See Agro Dutch Indus., 508 F.3d at 1029. However, SeAH's argument that § 1677b-1(a) directs Commerce to compensate for exchange rate variations is inapposite. In its full context the statute directs Commerce to use the exchange rate "in effect on the date of sale" for valuation of merchandise, and to ignore fluctuations on that particular date. 19 U.S.C. 1677b-1(a). The plain language does not mandate that Commerce compensate for a respondent's decision to report expenses in a foreign currency, as SeAH suggests.

## III.   Differential Pricing Analysis

In Stupp III, the Court of Appeals remanded for further explanation of Commerce's application of the Cohen's *d* test as part of its differential pricing

analysis.  Stupp III, 5 F.4th at 1360.  On remand, SeAH renews its argument that
Commerce's application of Cohen's $d$ test is flawed because it fails to take into account
assumptions of sample size, distribution, and variance underlying the test, and
further argues Commerce's choice of Cohen's large cutoff is arbitrary.  SeAH's Cmts.
at 6–24.  SeAH also claims random fluctuations in exchange rates can affect the $d$
coefficient, causing even test groups with identical prices to pass.  Id. at 24–28.
Commerce counters that its Cohen's $d$ analysis does not operate in a vacuum, and
must be considered with the ratio test and meaningful difference test.  See Remand
Results at 26, 28, 30–31, 41–42, 54–60.   Commerce also argues the cutoffs are tied
to real-world criteria, that small fluctuations in price will not lead to "false positives"
in Cohen's test, and that use of the 0.8 threshold results in reasonably infrequent
application of alternative methodologies.  Remand Results at 16–19, 32, 54–60.  For
the following reasons, Commerce has adequately addressed Court of Appeals'
concerns.

When investigating whether subject merchandise is being sold at less than fair
value, Commerce typically compares "the weighted average of the normal values to
the weighted average of the export (and constructed export prices) for comparable
merchandise" unless it determines another method is appropriate.  19 U.S.C. § 1677f-
1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).  This average-to-average ("A-to-A") method
compares the weighted average of a respondent's home country sales prices during
the investigation period to the weighted average of the respondent's sales prices in

the United States during the same period.  <u>See</u> 19 C.F.R. § 351.414(b)(1).  One concern

with the A-to-A method is that it may allow a foreign producer or exporter to engage

in "targeted dumping," which occurs when an exporter sells at a dumped price to

particular customers or regions, while selling at higher prices to other customers or

regions.  <u>See</u> <u>Apex Frozen Foods Priv. Ltd. v. United States</u>, 862 F.3d 1337, 1341 (Fed.

Cir. 2017) ("Apex II").  As a result, higher-priced products can mask dumped products

when Commerce averages the sales using the A-to-A method.

Congress addressed concerns over targeted dumping with the passage of 19

U.S.C. § 1677f-1(d)(1)(B).  <u>See</u> <u>Apex II</u>, 862 F.3d at 1342.  Section 1677f-1(d)(1)(B)

allows Commerce to compare "the weighted average of the normal values to export

prices . . . of individual transactions for comparable merchandise if (i) there is a

pattern of export prices . . . for comparable merchandise that differ significantly

among purchasers, regions or periods of time, and  (ii) [Commerce] explains why such

differences cannot be taken into account using [the A-to-A method or transaction-to-

transaction method[5]]."  19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii).  Targeted dumping is more

likely when export prices fit a pricing model that differs significantly across different

market segments.  <u>Apex II</u>, 862 F.3d at 1341–42.  Congress has not provided a method

for Commerce to use to determine whether a pattern of significantly different prices

---

[5] Commerce's regulations provide that the transaction-to-transaction method, which compares prices of individual transactions, will be employed only in rare cases, "such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made." 19 C.F.R. § 351.414(c)(2).

Consol. Court No. 15-00334                                                                  Page 14

exists.  However, the Statement of Administrative Action ("SAA") of the Uruguay

Round Agreements Act explains that Commerce should proceed "on a case-by-case

basis, because small differences may be significant for one industry or one type of

product, but not for another."  Uruguay Round Agreements Act, Statement of

Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 842–43 (1994), reprinted in

1994 U.S.C.C.A.N. 4040, 4178.[6]

        To determine whether the criteria set forth in § 1677f-1(d)(1)(B) are met,

Commerce conducts a "differential pricing analysis" of a respondent's sales.  See

Differential Pricing Analysis; Request for  Comments, 79 Fed. Reg. 26,720, 26,722

(Dep't of Commerce May 9, 2014).  This analysis contains three tests.  First,

Commerce applies to respondent's sales what it refers to as the "Cohen's $d$ test,"

described in more detail below, which measures the degree of price disparity between

groups of sales.  Id.  Commerce then counts the percentage of sales by value which

"pass" the Cohen's $d$ test, and applies its "ratio test."  Id. at 26,722–23.  If  33% of

respondent's sales or less pass,  Commerce uses the A-to-A method, and if 66% or

more pass, Commerce uses the A-to-T method.  Id.  If the total percentage of passing

sales is between 33% and 66%, Commerce takes a hybrid approach, applying the A-

to-T method to those sales passing the test, and the A-to-A method to the remainder.

Id.  Finally, if Commerce has not selected the A-to-A method for all sales, it applies

---

[6] The SAA is an "authoritative expression by the United States concerning the
interpretation and application" of the Uruguay Rounds Agreement Act. 19 U.S.C.
§ 3512(d).

the "meaningful difference" test to determine whether the A-to-A method could nevertheless account for the disparate pricing. Id. at 26,723.  Commerce applies the test by comparing a respondent's dumping margin using both A-to-A and the selected method.  Id.  If the A-to-A margin is below the de minimis threshold  and the margin from the selected method is not, or if both margins are above the threshold and differ by 25% or more, Commerce continues to use the selected method; otherwise, Commerce applies the A-to-A method for all sales.  Id.

As applied by Commerce, the Cohen's $d$ test involves comparing the product-specific prices of "test groups" of a respondent's sales to a "comparison group" by region, purchaser, and time period.  Stupp III, 5 F.4th at 1346.  For each category, Commerce segregates sales into subsets, with one subset becoming the test group, and the remaining subsets being combined as the comparison group.  Id.  Commerce then calculates the means and standard deviations of the test and comparison groups. Id.  Commerce then calculates a Cohen's $d$ coefficient by dividing the difference in the groups' means by the groups' standard deviation.[7]  Id.  Each subset is thus tested against the remaining subsets across each category, and assigned a $d$ coefficient by

---

[7] Thus, $d = |$ mean of test group $-$ mean of control group$| \div$ standard deviation. Commerce uses a modified version of this formula, substituting the square root of the simple average of the groups' variances for standard deviation.  The Cohen's $d$ test solves for a coefficient representing "effect size."  See generally Cohen, Jacob, Statistical Power Analysis for the Behavioral Sciences, (2nd ed. 1988), A-580-876, PRRD 8, bar code 4181776-01 (Nov. 12, 2021) ("Cohen").  "Effect size quantifies the size of the difference between two groups, and may therefore be said to be a true measure of the significance of the difference."  Coe at 7.

solving Cohen's ratio.  If the $d$ value of a test group is equal to or greater than the "large threshold," or 0.8, the observations within that group are said to have "passed" the Cohen's $d$ test.  Id. at 1347.

In Stupp III, the Court of Appeals expressed concern that Commerce's application of Cohen's $d$ under certain circumstances could undermine the usefulness of the test in less-than-fair-value determinations.  Specifically, the Court of Appeals identified three potential scenarios in which use of Cohen's $d$ could be problematic: first, when the distribution of a respondent's sales data is not normal, second, when the test groups have few data points, and third, when there is minimal variance in a respondent's sales.  Stupp III, 5 F.4th at 1357–59.  The assumption of normality is satisfied when a fixed percentage of the population falls within each standard deviation from the mean—in other words, that a population density graph generally shows a symmetrical, bell-shaped curve.  See Starnes, Yates, and Moore, Statistics through Applications, 116 (2005), A-580-876, PRRD 8, bar code 4181776-01 (Nov. 12, 2021).  The assumption of size is satisfied when the population is sufficiently large. See Cohen at 21.  The assumption of homogeneous variances is satisfied when the standard deviations of test and comparison groups are similar.  See Grissom at 68–69.  Commerce argued in Stupp III, as it does now, that the three assumptions are only relevant as a matter of statistical significance, and do not apply when analyzing a whole population; the Court of Appeals concluded that this explanation did not fully address its concerns.  Stupp III, 5 F.4th at 1360.

The Court of Appeals illustrated the problems it identified with the Cohen's $d$ test through two hypotheticals.  First, the Court of Appeals considered a situation in which Commerce analyzed a group of only eight export sales across four groups, such that each test group would consist of only two sales.  Stupp III, 5 F. 4th at 1358–59. With groups of such small numbers, the Court of Appeals pointed out that there would be some upward bias in effect size, such that the test would produce more "passing" results, and potentially exaggerate dumping margins.  Id. at 1359.  The Court of Appeals also observed that a group of only two sales would lack normality. Id.  Second, the Court of Appeals described a test group of five sales of about $100 each, which differed from one-another by up to two cents.  Id.  Because the standard deviation of such a group would be so small, the Court of Appeals pointed out that the denominator in Cohen's ratio would be drastically reduced, again causing an increase in effect size, and inflating the resulting dumping margin.  Id.  The Court of Appeals noted that an objective examiner looking at these similar sales prices "would be unlikely to conclude that they embody a 'pattern' of prices which 'differ significantly.'"  Id. (citing 19 U.S.C. § 1677f-1(d)(1)(B)(i)).

Commerce reasonably explains that Cohen's $d$ test does not operate in a vacuum, but as part of the differential pricing analysis as a whole.[8]  Turning first to

---

[8] The parties devote a significant part of their briefings to discussion of (1) the permissibility of using Cohen's $d$ test on full populations, and (2) questions of

(footnote continued)

the assumptions of population size and normalcy, the Court of Appeals questioned

whether small sample sizes without normal distributions could "exaggerate"

dumping margins by introducing an "upward bias" to effect size. Stupp III, 5 F.4th at

1359.[9]  Addressing the Court of Appeals' concerns about population size, Commerce

---

statistical significance versus practical significance. See Remand Results at 11–16,
43–51; SeAH's Cmts. at 7–10; Def.'s Br. at 12–20; Welspun's Br. at 21–23; SeAH's
Reply at 17–27; Def's Sur-Reply at 12–29, 34–35; SeAH's Sur-Reply at 16–24. Neither
question is determinative of whether Commerce's methodology is reasonable. Both
arguments have already been raised before the Court of Appeals, which concluded
that they did not resolve its concern over whether the absence of certain assumptions
forecloses Commerce's use of Cohen's $d$ test. Stupp III, 5 F.4th at 1360.

Commerce correctly asserts that a "t-test" for statistical significance is used
with sampled data, and that Dr. Cohen considered normal distribution and equal
variance as necessary assumptions in a t-test. See Cohen at 19; Remand Results at
12–16. However, Commerce improperly reasons that because there is no need for a
t-test, there is no basis for the assumptions. Remand Results at 14. Commerce also
asserts that SeAH's assumptions are only relevant as a matter of statistical
significance, and that they do not apply because Cohen's $d$ test determines practical
significance. Remand Results at 14, 43–45. That these assumptions are required
for questions of statistical significance does not answer the question of whether they
are also needed to determine practical significance, as the Court of Appeals suggests.
See Stupp III, 5 F.4th at 1360.

Although SeAH claims that academic sources do not support Commerce's use
of Cohen's $d$ in its differential pricing analysis, this argument is inapposite. SeAH's
decision to substantially advance its arguments using labels taken from statistical
literature does not alter the court's obligation on review. See Soc Trang Seafood Joint
Stock Co. v. United States, 321 F. Supp. 3d 1329, 1339 n.13 (2018) ("the fact that
Commerce has adopted a methodology based upon a statistical tool known as Cohen's
$d$, and chooses to refer to this methodology as Cohen's $d$, does not diminish the
discretion granted to Commerce"); see also Mid Continent Steel & Wire, Inc. v. United
States, 31 F.4th 1367 (Fed. Cir. 2022) ("Commerce's job is not to follow a statistical
test as explained in published literature for its own sake, but to implement the
statutory mandate to determine when prices of certain groups "differ significantly").
[9] Although the parties dispute whether such results are really "false positives," it is
undisputed that in at least some instances, groups with as few as two sales have

(footnote continued)

explains that its Cohen's $d$ analysis does not stand alone, and operates together with the ratio test and meaningful difference test. <u>See</u> Remand Results at 26, 28, 30–31, 41–42, 54–60. Thus, even if the Cohen's $d$ values of small test groups were less accurate than for large test groups, this difference does not by itself render Commerce's use of Cohen's test unreasonable, because the ratio test and meaningful difference test compensate for inaccuracies. <u>See id.</u> Commerce's differential pricing analysis looks at the frequency and impact of effect size to detect targeted dumping—not the effect size alone. <u>See</u> Cohen at 8; Remand Results at 26–28. As Commerce points out in its remand redetermination, the "sole purpose of the Cohen's $d$ test" is to determine whether prices "differ significantly" across region, time period, or customer. Remand Results at 41. The "pattern" of export prices which Commerce must find under 19 U.S.C. § 1677f-1(d)(1)(B)(i) is then determined by the ratio test. <u>Id.</u> at 42. The ratio test has already been approved by the Court of Appeals, which found that Commerce's choice of the 33% and 66% thresholds was a "reasonable choice." <u>Stupp III</u>, 5 F.4th at 1355. SeAH's attacks on Cohen's $d$ test presuppose that what SeAH claims are "false positives" automatically affect the accuracy of

---

passed Cohen's test. <u>See</u> <u>Stupp III</u>, 5 F.4th at 1357; SeAH's Cmts. at 17–19; <u>see</u> Remand Results at 55, 58–59. Identifying results as "false" positives begs the question of what is a false positive. <u>See</u> Remand Results at 59 ("To label this result a 'false-positive' does not render the variances inaccurate or erroneous"). SeAH illustrates this situation using data from its own sales, showing how a group of only two sales to a single customer passed Cohen's test, despite SeAH's observation that a visual comparison of the groups on a graph showed those sales to be near the average price. SeAH's Cmts. at 18. Commerce counters that a visual inspection may be inadequate in situations involving complex calculations. Remand Results at 59.

Consol. Court No. 15-00334                                                    Page 20

Commerce's differential pricing analysis, when in fact Commerce has allowed for 33%

positives before there is any potential effect on a respondent's dumping margins.

Commerce also addresses the Court of Appeals' concern whether samples

without normal distributions will produce an inappropriate number of passes.  SeAH

points to numerous academic sources which it claims confirm the usefulness of

Cohen's test is compromised when comparing data sets with non-normal

distributions.  <u>See</u> SeAH's Cmts. at 7, n.19 (citing Cohen at 13); <u>Id.</u> at 12 (citing Ellis

at 41); <u>Id.</u> at 13 (citing Starnes, Yates, and Moore at 135).  The Court of Appeals has

acknowledged some of these sources.  <u>See</u> <u>Stupp III</u>, 5 F.4th at 1357–59 (citing Cohen

at 21, Grissom & Kim at 66, Coe at 13, Lane at 645, Algina at 318, and Li at 1571).

The court need not opine on the relevance of these academic observations;[10] however,

it logically follows that a relatively large-tailed distribution (i.e., with large standard

deviation) in a test group would tend to decrease Cohen's $d$ coefficient, while the

opposite would result in an increase.  <u>See</u> Remand Results at 29 ("in other words, the

fat-tailed distribution may <u>undervalue</u> the significance of effect") (emphasis in

---

[10] The task of the court is not to interpret the meaning of literature treating with
correct application of Cohen's $d$.  Rather, the court must determine whether
Commerce's methodology is reasonable in light of considerations that run counter to
its decision.  <u>See</u> <u>Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.</u>,
463 U.S. 29, 43 (1983); <u>Ceramica Regiomontana, S.A. v. United States</u>, 636 F. Supp.
961, 966 (Ct. Int'l Tr. 1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("As long as
the agency's methodology and procedures are reasonable means of effectuating the
statutory purpose, and there is substantial evidence in the record supporting the
agency's conclusions, the court will not impose its own views as to the sufficiency of
the agency's investigation or question the agency's methodology").

original).  SeAH focuses on the second of these two scenarios, arguing that even inputting random data, such as exchange rates, can cause test groups to frequently pass Cohen's *d* test.  SeAH's Cmts. at 25–28.  SeAH further argues that the ratio test does not account for such random fluctuations.[11]  Oral Argument at 0:42:57–0:43:43. Commerce addresses these arguments by explaining that even if Cohen's test can produce positive results under unusual circumstances, this possibility does not mean its use of Cohen's *d* is unreasonable when combined with the ratio test and meaningful difference test.  See Remand Results at 26, 28, 30–31, 41–42, 54–60.

The Court of Appeals also specifically asked Commerce to explain why it can use the 0.8 threshold identified by Dr. Cohen as a measure of a significant price difference, when Commerce evaluates data which fails to meet statistical assumptions of normality, size and variance.[12]  Stupp III, 5 F.4th at 1360.  Although Commerce reiterates those assumptions are irrelevant, see Remand Results at 11–

---

[11] Commerce explains that, even if exchange rate fluctuations do affect prices, this effect is not "random" because a respondent can control in which currency it denominates its prices.  Remand Results at 45; Oral Argument at 0:49:11–0:50:05.

[12] Although the Court of Appeals approved the 0.8 cutoff in Mid Continent Steel & Wire, Inc. v. United States, it explained in Stupp III that it had yet to consider the reasonableness of the 0.8 cutoff value when the assumptions in question have not been met.  Stupp III, 5 F.4th at 1356–57("We held that . . . it is reasonable to adopt that [0.8] measure where there is no better objective measure of effect size.  We did not, however, address SeAH's second argument [on assumptions] in Mid Continent") (citation omitted) discussing Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662, 673 (Fed. Cir. 2019); see also  Oral Argument at 1:39:45–1:40:30.  More specifically, SeAH argues that it is unreasonable to compare its prices, which are not normally distributed, using a subjective benchmark that was derived from a normally-distributed population.  SeAH's Cmts. at 10–12.

16, it also explains its choice of the 0.8 threshold as a function of its differential pricing analysis.   First, Commerce explains that it employs the 0.8 threshold to identify where prices "differ significantly" pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i). Remand Results at 11.  Second, Commerce states the 0.8 measurement "represents a difference which is 'grossly perceptible.'"   Remand Results at 52.   Reasonably discernible from this statement is that Commerce considers a significant difference to be grossly perceptible in the same way that Dr. Cohen identified a large threshold as one that is "grossly perceptible." See Cohen at 27.  The SAA to the Uruguay Round Agreements Act directs Commerce to proceed "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another," SAA at 842–43; thus, Commerce's choice of a measurement that is a function of standard deviation as a uniform approach to identify differences as significant is reasonable, even if the absolute difference in means is small. Commerce's approach tailors the question of what is a significant difference in price to the pricing parameters of different products.   Third, Commerce adequately explains its adoption of Cohen's widely-recognized choice of 0.8 as a large threshold as significant.  Remand Results at 18.  It explains that it chose the 0.8 standard because it was "a conservative standard to determine that the observed price differences are significant." Id. Commerce summarizes its reasoning by explaining that "[u]sing Dr. Cohen's thresholds is a reasonable approach to interpret whether the difference in the prices is significant and the further interpretation of the

Consol. Court No. 15-00334                                                           Page 23

difference in the prices in the context of the calculation of dumping margins ensures

the reasonable and limited application of the alternative comparison methodology."

Id. at 33.  Thus, Commerce chose a threshold it predicted would result in limited

application of the alternative methodology.

Although Commerce adopted this yardstick from Dr. Cohen, and did so because

it was widely acknowledged in the statistical literature, Commerce does not rely on

the prominence of this yardstick alone.  Commerce elaborates that its "actual

application of the Cohen's $d$ test in the context of the differential pricing analysis

resulted in the application of an alternative comparison methodology to a relatively

small number of respondents."  Remand Results at 32.  Discernible from Commerce's

explanation is that the 0.8 cutoff produces reasonable passing rates once the ratio

and meaningful difference tests are applied.  SeAH challenges Commerce's reliance

on the 0.8 threshold as large, arguing that Commerce's only basis for using the

threshold is that it is widely accepted.  SeAH's Cmts. at 10–11.  However, in addition

to relying on a widely-accepted standard for "grossly perceptible" to determine what

is significant, Commerce defines "significant" with reference to the impact a price

difference has on a respondent's dumping margins.  Remand Results at 32.  Finding

that the 0.8 threshold leads to relatively few determinations of targeted dumping,

Commerce concludes that its choice is reasonable.  Id.

Congress delegated to Commerce the authority to determine where a price

difference is significant.  19 U.S.C. § 1677f-1(d)(1)(B)(i).  Congress also made clear

Consol. Court No. 15-00334                                                    Page 24

that the definition of a "significant price difference" would depend on the product at issue. See SAA at 842–43. Thus, Congress entrusted Commerce to use its expertise and knowledge of pricing to gauge price distinctions. Cf. Fujitsu General Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (granting Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature"). Commerce's decision to adopt Cohen's 0.8 ("large") threshold as a measure of significance because it is widely accepted in the statistical literature does not undermine the reasonableness of that choice, if it is based on Commerce's expertise and Commerce demonstrates the reasonableness of that choice with reference to the impact it has on the differential pricing analysis. Thus, Commerce's reference to Cohen's work does not circumscribe its discretion to choose the same values in a new context, because that choice is itself reasonable.

Commerce addresses the Court of Appeals' concern that prices with small variances, which hover around the same value, will produce inaccurate results on Cohen's test. As an initial matter, Commerce explains that results which pass Cohen's test under these circumstances are not "false positives," as small differences in average prices will mean that variances, too, will be small. Remand Results at 59; Oral Argument at 1:06:32–1:07:02. Thus, it is discernable that a small variance means a small difference in price will be more significant, and a passing result under these circumstances is not necessarily "erroneous." Remand Results at 59. Nevertheless, the Court of Appeals observed that an objective examiner considering

a group of sales where prices differed by only a few cents would be unlikely to conclude

that they show a "pattern" of prices that "differ significantly" under the statute.

Stupp III, 5 F.4th at 1359.  Commerce responds to this issue by pointing out that an

examiner would indeed conclude that there was no pattern—because Commerce does

not look for a pattern at this stage of its differential pricing analysis.  Remand Results

at 41.  Again, Commerce explains that the ratio test determines whether a pattern

exists, while Cohen's $d$ test only shows whether there are significant price differences.

Id. at 41–42.  Thus, Cohen's test would need to generate enough "false positives" to

overcome the 33% threshold, at minimum, and there is no evidence on the record

suggesting that price patterns, such as that proposed by the Court of Appeals, occur

with frequency in SeAH's sales.

Additionally, to specifically address the hypothetical proposed by the Court of

Appeals, Commerce explains that, in addition to the ratio test, the meaningful

difference test would prevent low-variance sales which pass Cohen's $d$ test from

impacting a respondent's dumping margins.  See Remand Results at 30–31.  Adopting

the Court of Appeals' example in which all of a respondent's prices hovered around

$100 and passed Cohen's test, Commerce explains that even in this extreme scenario,

the respondent would still be assessed under the A-to-A method.  Id.  Choosing a

normal value for comparison equal to the highest sales price, and thus maximizing

the respondent's theoretical dumping margin, Commerce observes the margin would

still be under the 2% de minimis threshold.  Id.; see 19 U.S.C § 1673d(a)(4),

Consol. Court No. 15-00334                                          Page 26

1673b(b)(3).  SeAH argues that Commerce's reliance on the meaningful difference

test is misplaced, because even changes of less than 2% in a respondent's dumping

margin can cross the de minimis threshold and result in a "meaningful difference"

finding.  SeAH's Sur-Reply at 15.  Specifically, SeAH argues that when the Cohen's

$d$ results from small-variance data sets of different products are cumulated,

Commerce may find that a respondent's sales pass the thresholds for both ratio test

and the meaningful difference test, even if price differences are negligible.  Oral

Argument at 1:13:37–1:16:06.[13]  This argument overstates Commerce's position.  It is

reasonably discernable that Commerce does not rely on the meaningful difference

test to prevent all "inappropriate" passes from affecting a respondent's dumping

margins.  Commerce has explained the meaningful difference test compensates for a

specific concern with low-variance sales which the Court of Appeals identified.  See

Stupp III, 5 F.4th at 1359; Remand Results at 30–31.  Moreover, SeAH's argument is

misplaced, because the question before the court is not whether it is possible to

construct an unusual scenario where Cohen's $d$ test can result in an alternative

comparison method.  Rather, the question is whether Commerce's use of Cohen's test,

when applied as a component of its differential pricing analysis, is reasonable.  See

Ceramica Regiomontana, S.A. v. United States, 636 F. Supp. 961, 966 (Ct. Int'l Tr.

---

[13] SeAH does not argue that it received an alternative method because its own combined sales inappropriately passed the Cohen's $d$ test.  Rather it offers a hypothetical to challenge the reasonableness of Commerce's methodology more generally.  SeAH's Cmts. at 8, 14–21.

Consol. Court No. 15-00334                                                    Page 27

1986).  Thus, for the forgoing reasons, Commerce has adequately explained how its

methodology is reasonable.

## CONCLUSION

For the foregoing reasons, Commerce's remand results are supported by

substantial evidence and comply with the court's Order, Oct. 8, 2021, ECF No. 192,

in conformity with the Court of Appeals' Mandate, Oct. 8, 2021, ECF No. 191, and are

therefore sustained.  Judgment will enter accordingly.

<div style="text-align: right">

 /s/ Claire R. Kelly  
Claire R. Kelly, Judge

</div>

Dated:        February 24, 2023  
              New York, New York