UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| HISTEEL CO., LTD., <br><br> Plaintiff, <br><br> and <br><br> DONG-A-STEEL CO., LTD, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR TUBULAR PRODUCTS INC. <br><br> Defendant-Intervenor. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Court No. 22-00142 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

HISTEEL CO., LTD.
COMMENTS IN OPPOSITION TO
FINAL REDETERMINATION ON REMAND

PUBLIC DOCUMENT

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for HiSteel Co., Ltd.

May 29, 2026

Table of Contents

Page

INTRODUCTION ................................................................................................ 2

ARGUMENT ..................................................................................................... 6

    A.   Under the Supreme Court's Decision in
        Loper-Bright, It Is This Court's Responsibility
        to Give Meaning to the Statutory Terms ................................................ 6

    B.   The Two-Percent Test Is Not Consistent with
        the Ordinary Meaning of the Statutory Terms ....................................... 8

        1.   A "Pattern" Exists within the Meaning
              of the Statute Only When the Observed
              Situation Did Not Occur by Chance ............................................... 8

        2.   The Two-Percent Test Does Not Distinguish
              Patterns from Random Fluctuations ............................................. 11

        3.   The Ratio Test Portion of the Differential
              Pricing Analysis Is Not Sufficient to
              Establish that a "Pattern" Exists ................................................. 14

        4.   Commerce Has Failed to Satisfy Its Burden
              of Proof to Establish that a "Pattern" Exists ............................... 15

    C.   The Two-Percent Test Does Not Comply with
        the SAA's Requirement that Commerce's
        Analysis Take Into Account the Significance of the
        Observed Differences for the Industry and Product ............................. 16

    D.   Commerce's Elimination of the Court-
        Approved "Mixed Methodology" Was Beyond
        the Scope of the Remand in This Appeal ............................................. 18

CONCLUSION .............................................................................................. 21

Table of Authorities

Page

CASES

*Aydin v. Widnall*,
   121 F.3d 726 (Fed. Cir. 1997) ...................................................................... 20

*Clearon Corp. v. United States*,
   37 ITRD 1951 (CIT 2015) ........................................................................... 13

*Consumer Products Safety Commission v. GTE Sylvania, Inc.*,
   447 U.S. 102 (1980) ....................................................................................... 7

*Creswell Trading Co. Inc. v. U.S.*,
   15 F.3d 1054 (Fed. Cir. 1994) ...................................................................... 16

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024) ....................................................................................... 7

*Masters, Mates and Pilots Maritime Advancement, Training,*
   *Education and Safety Program v. Department of Commerce,*
   729 F.2d 748 (Fed. Cir. 1984) ...................................................................... 13

*Stupp v. United States*,
   5 F.4th at 1341 (Fed. Cir. 2021) ............................................................. *passim*

*Stupp v. United States*,
   No. 23-1663 (Fed. Cir., Apr. 23, 2025) .................................................. *passim*

*Thole v. U. S. Bank,*
   590 U.S. 538 (2020) ....................................................................................... 7

*Tri Union Frozen Products,*
   163 F.Supp. 3d 1255 (CIT 2016) .................................................................. 20

*United Steel, Paper & Forestry, Rubber, Mfg., Energy,*
   *Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*,
   151 F. Supp. 3d 76 (D.D.C. 2015) ............................................................... 21

STATUTES

19 U.S.C. §1677f-1……………………………………………………………..2, 15

Statement of Administrative Action accompanying
   the Uruguay Round Agreements Act,
   H.R. Doc. 103–316 (1994)………………………………………    ……….*passim*

Page

AGENCY ANNOUNCEMENTS

*Alternatives to the Use of Cohen's d; Request for Comment,*
   90 Fed. Reg. 21277 (May 19, 2025)……………………………………………………5

*Antidumping Duties; Countervailing Duties:*
   *Notice of Proposed Rulemaking and Request for Public Comments,*
   61 Fed. Reg. 7308, 7350 (Feb. 27, 1996)…………………………………………….2

*Antidumping Duties; Countervailing Duties; Final Rule,*
   62 Fed. Reg. 27296, 27416 (May 19, 1997)……………………….……………...2

AGENCY DECISIONS

*Certain Steel Nails from the People's Republic of China,*
   73 Fed. Reg. 33977 (June 16, 2008)……………………………………………...3, 12

*Coated Free Sheet Paper from Korea,*
   72 Fed. Reg. 60630 (Oct. 25, 2007)………………………………….…………3

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea:*
   *Final Results of Antidumping Duty Administrative Review; 2022–2023,*
   90 Fed. Reg. 30050 (July 8, 2025)……………………………………………...5

*Welded Line Pipe From the Republic of Korea:*
   *Final Determination of Sales at Less Than Fair Value,*
   80 Fed. Reg. 61366 (Oct. 13, 2015)……………………………………..…...9

ACADEMIC TEXTS

Cohen, Jacob,
   *Statistical Power Analysis for the Behavioral Sciences* (2d ed. 1988)……………11, 12

Ellis, Paul,
   *The Essential Guide to Effect Sizes: Statistical Power,*
   *Meta-Analysis, and the Interpretation of Research Results* (2010)…………………...11

Public Document

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| HISTEEL CO., LTD., | ) |
| Plaintiff, | ) |
| and | ) |
| DONG-A-STEEL CO., LTD, | ) |
| Plaintiff-Intervenor, | ) |
| v. | ) Court No. 22-00142 |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| NUCOR TUBULAR PRODUCTS INC. | ) |
| Defendant-Intervenor. | ) |

HISTEEL CO., LTD.
COMMENTS IN OPPOSITION TO
FINAL REDETERMINATION ON REMAND

These comments are submitted on behalf of HiSteel Co., Ltd. ("HiSteel") in opposition to the final redetermination by the U.S. Department of Commerce dated March 31, 2026, addressing the April 23, 2025, decision by the Court of Appeals for the Federal Circuit in *Stupp Corp. et al. v. United States,* CAFC Court No. 2023-1663, (Fed. Cir. April 23, 2025), and the remand order issued by the Court of International Trade on September 12, 2023, and procedural order issued on August 20, 205, in CIT Court No. 22-00142, addressing the Department's final determination in the in the fourth administrative

Public Document

review of the antidumping order on *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea*.[1]

### INTRODUCTION

In 1995, Congress amended the antidumping statute to permit the Department of Commerce to modify its calculations to increase dumping margins by using an average-to-transaction methodology rather than an average-to-average methodology.  The statute permits Commerce to depart from the normal "average-to-average" comparison only when it finds that "there is a *pattern* of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time...."[2]  Commerce's first reaction to this statutory requirement was to look to "standard and appropriate statistical practices" to help it distinguish patterns from random occurrences.[3]  This approach was initially supported by representatives of domestic industries and foreign exporters.[4]  But, as might be expected, the consensus in favor of statistical approaches lasted only until the first politically-sensitive case in which targeted dumping was alleged, and in which "standard and appropriate statistical practices" did not support a finding of targeted dumping.

---

[1] The Department's March 31 redetermination is hereinafter referred to as the "Redetermination."

[2] *See* 19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added).

[3] *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27296, 27416 (May 19, 1997) (Section 351.414(f)(1) of final regulations).

[4] *See Antidumping Duties; Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments*, 61 Fed. Reg. 7308, 7350 (Feb. 27, 1996) ("{T}he Department has incorporated the suggestion made by several commentators, including both domestic and respondent interests, that the Department employ standard statistical techniques, in identifying targeted dumping.").

Public Document

In 2007, under pressure from petitioners in an investigation of *Coated Free Sheet Paper from Korea*, Commerce abruptly withdrew its regulation requiring use of "standard and appropriate statistical practices," and instead applied a simplistic "P2" test proposed by petitioners. The "P2" test found "targeted dumping" when the average price for sales to the allegedly targeted customer differed from the average price to other sales by more than two percent.[5] But adoption of this new test made no difference in the *Coated Paper* case: The three Korean exporters to whom the test were applied were found to have *de minimis* dumping margins even after application of the "P2" test.[6] And Commerce's determination in that case made clear that it had applied the "P2" test at petitioner's request "*without endorsing the petitioner's test standards and procedures as a general practice.*"[7]

The test applied in *Coated Paper* was summarily jettisoned less than a year later. In the investigation of *Steel Nails from China,* the Department held that the two-percent test was not a "reliable measure for detecting 'obvious' examples of targeted dumping," because it "does not adequately account for price variations specific to the market in question."[8] In light of these flaws, the Department discarded that methodology and instead

---

[5] *See Coated Free Sheet Paper from Korea,* 72 Fed. Reg. 60630 (Oct. 25, 2007), and accompanying Issues & Decision Memorandum at General Comment 2 (hereinafter, *Coated Paper* I&D Memorandum").

[6] The three companies that were the subject to targeted dumping allegations were Hansol, Moorim and Hankuk. *See Coated Paper* I&D Memorandum at General Comment 1, n.3. The dumping margins for all three of those companies were *de minimis. See* 72 Fed. Reg. at 60631.

[7] *See Coated Paper* I&D Memorandum at General Comment 2 .

[8] *See Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33977 (June 16, 2008), and accompanying Issues & Decision Memorandum at Comment 8 (hereinafter, "*Nails* I&D Memorandum") .

adopted a different test (known subsequently as the *Nails* test), which it applied

consistently until the adoption of the Differential Pricing Analysis in 2013.

As this Court knows well, the Differential Pricing Analysis returned to the use of a

standard statistical measure of "effect size" known as Cohen's *d* to determine whether the

requisite pattern of price differences existed. Parties have challenged the use of Cohen's *d*

since it was first proposed, not because reliance on statistical measures of "effect size" is

misguided, but because Cohen's *d* is an appropriate measure only in certain limited

circumstances that do not exist in this, or most other antidumping cases.

In its 2021 *Stupp* decision, the Federal Circuit agreed with that critique. As the

Federal Circuit explained,

> ... Professor Cohen derived his interpretive cutoffs under certain
> assumptions. Violating those assumptions can subvert the usefulness
> of the interpretive cutoffs, transforming what might be a conservative
> cutoff into a meaningless comparator.[9]

And, in its April 2025 *Stupp* decision, the Federal Circuit rejected Commerce's efforts to

explain why use of Cohen's *d* was justifiable when the assumptions required by Professor

Cohen were not satisfied.[10] Accordingly, this Court remanded this case back to Commerce

for further proceedings in conformity with the Federal Circuit's decision, setting the

deadline for the final remand redetermination on March 31, 2026.[11]

---

[9] *Stupp v. United States*, 5 F.4th at 1341, 1360 (Fed. Cir. 2021) (hereinafter, "*Stupp III*").

[10] *See Stupp v. United States*, No. 23-1663 (Fed. Cir., Apr. 23, 2025) (hereinafter, "*Stupp V*").

[11] *See* Court's August 20, 2025, Order (ECF No. 89) (remanding the case based following the joint status report filed on August 18, 2025). *See* Parties' August 18, 2025, Joint Status Report (ECF No. 88) (agreeing that the Court should remand the case to comply with the Federal Circuit's decision in *Stupp V*).

Shortly after the Federal Circuit's *Stupp* decision, Commerce published a request for comments on alternatives to Cohen's *d*.[12]  But Commerce allowed only 11 days for those comments to be submitted.  And roughly one month after comments were due, Commerce issued a final determination in the seventh administrative review of *Heavy-Walled Rectangular Pipe from Korea* in which, without allowing the parties any opportunity to comment, it adopted a modified version of the Differential Pricing Analysis.[13]  Under this modified approach, the previous Cohen's *d* test was replaced with a simple two-percent test, and the old "ratio test" was modified to apply the average-to-transaction methodology whenever 33 percent of the sales were found to "pass" the two-percent test, thus eliminating the use of the "mixed methodology" that had previously been applied when between 33 and 66 percent of the sales "passed" the Cohen's *d* test.[14]  In the end, however, the dumping margins found in that review were *de minimis*, making the change in the Differential Pricing Analysis irrelevant.[15]

On December 30, 2025, Commerce issued the draft remand redetermination in this case.  Commerce did not allow the parties any opportunity to submit new factual information on alternatives to Cohen's *d*.[16]  And its draft redetermination simply applied

---

[12] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21277 (May 19, 2025).

[13] *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea: Final Results of Antidumping Duty Administrative Review; 2022–2023,* 90 Fed. Reg. 30050 (July 8, 2025), and accompanying Issues and Decision Memorandum (July 1, 2025), at 3.

[14] *See id*.

[15] *Id*.

[16] *See e.g.*, Redetermination at 3 (ECF No. 91).

Public Document

the new methodology that had been adopted in the seventh administrative review of *Heavy-Walled Rectangular Pipe* without any attempt to justify the new methodology.[17]

The absence of any attempt at justification is hardly surprising. As mentioned, the two-percent test in the first stage of the new methodology was explicitly rejected by Commerce in the past precisely because it was not a "reliable measure" that "does not adequately account for price variations specific to the market in question." And, given that the Federal Circuit had explicitly upheld Commerce's use of the "mixed methodology" in its decisions regarding the Differential Pricing Analysis, Commerce's elimination of that methodology was beyond the scope of its remand authority.

Commerce's final redetermination offers only weak rationalizations for these changes. Rather than taking the Federal Circuit's criticisms to heart and developing a sound methodology for distinguishing true "patterns" from chance fluctuations, Commerce has decided to punish all respondents by adopting a new methodology that will inflate dumping margins in almost every case. Such conduct is hardly consistent with the fundamental presumption that agencies act in good faith in administering Congressional directives. This case must be remanded once more.

<u>ARGUMENT</u>

A.   *Under the Supreme Court's Decision in*
     <u>*Loper-Bright*</u>*, It Is This Court's Responsibility*
     *to Give Meaning to the Statutory Terms*

Under the Supreme Court's decision in *Loper Bright,* "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory

---

[17] *See id*. at 4 note 15 (ECF No. 91).

authority, as the APA requires."[18]  That judgment, in turn, requires use of the traditional

tools of statutory interpretation.[19]  The starting point is, of course, the language of the

statute.[20]

As the Federal Circuit has explained, Commerce's Differential Pricing Analysis is

itself an interpretation of the statute:

> Commerce's differential pricing analysis ... interprets the statutory
> provision that applies to patterns of significantly differing export
> prices by providing a mechanism for identifying such patterns.[21]

Commerce's previous interpretation was ultimately rejected by the Federal Circuit in its

2021 and 2025 decisions in *Stupp*.  The Court must now decide whether Commerce's new

interpretation — as reflected in its revised Differential Pricing Analysis — accords with

the statute.  And, in doing so, the Court must interpret the statute using the traditional tools

of statutory interpretation without deferring to the agency.

---

[18] *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024).

[19] According to the Court,

> *Chevron* gravely erred, though, in concluding that the inquiry is
> fundamentally different just because an administrative interpretation is
> in play. The very point of the traditional tools of statutory
> construction—the tools courts use every day—is to resolve statutory
> ambiguities. That is no less true when the ambiguity is about the scope
> of an agency's own power—perhaps the occasion on which abdication
> in favor of the agency is least appropriate.

*Id.,* at 401.

[20] *See, e.g., Consumer Products Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980); *Thole v. U. S. Bank,* 590 U.S. 538, 549 (2020).

[21] *Stupp III,* 5 F.4th at 1352.

B.    *The Two-Percent Test Is Not Consistent with the Ordinary Meaning of the Statutory Terms*

1.    *A "Pattern" Exists within the Meaning of the Statute Only When the Observed Situation Did Not Occur by Chance*

Any interpretation of the relevant statutory provision must give meaning to its terms — and, in particular, the word "pattern." The ordinary meaning of that word is clear. As one online dictionary explains, "A pattern is the repeated or regular way in which something happens or is done."[22] The same dictionary distinguishes "patterns" from "random" occurrences as follows:

> If you describe events as *random*, you mean that they do not seem to follow a definite plan or *pattern*.[23]

In a legal context, the term "pattern" has been defined to mean "A mode of behavior or series of acts that are *recognizably consistent*."[24] Under all of these definitions, random fluctuations do not constitute a "pattern." Consequently, it is not sufficient for Commerce to identify prices that simply *differ* among purchasers, regions, or time periods. Instead, Commerce must also demonstrate, based on the evidence, that any observed price differences are not the result of random processes and reflect a *pattern*.

---

[22] *See* Collins Dictionary, www.collinsdictionary.com/dictionary/english/pattern (retrieved September 16, 2025).

[23] *See* Collins Dictionary, www.collinsdictionary.com/dictionary/english/random (retrieved September 16, 2025) (emphasis added). *See also See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) at 1029 (defining the term "random" to mean "lacking a definite plan, purpose, or *pattern*." (emphasis added)).

[24] *See* BLACK'S LAW DICTIONARY, 8th ed. 2024, at 1164.

- 8 -

The Redetermination attempts to avoid this conclusion by citing one online dictionary that defines the word "pattern" to mean "a frequent or widespread incidence."[25]  However, the definition they cite is only one of eleven definitions listed in that online dictionary. Another definition of "pattern" in the same dictionary include "a reliable sample of traits, acts, tendencies, or other observable characteristics of a person, group, or institution" (as in "a behavior pattern").[26]  Furthermore, the same dictionary defines the term "random" to mean "lacking a definite plan, purpose, or *pattern*."[27]  Taken as a whole, the definitions in the dictionary preferred by Commerce confirm that the statute requires that there be a pattern of behavior that goes beyond what might be expected to occur by chance.

Significantly, Commerce's original determination in this case agreed that a "pattern" within the meaning of the statute existed only when apparent price differences are beyond something that might occur by chance.  As Commerce explained,

> a 'pattern of prices that differ significantly among purchasers, regions or time periods' means that the Department is examining the extent to which the prices, when ordered by purchaser, region or time period, exhibit differences which have meaning, which have or may have influence or effect, which are noticeably or measurably large, and *which may be beyond something that occurs by chance*....[28]

---

[25] *See* Redetermination at 16 (citing Pattern, Merriam-Webster Online Dictionary, available at « www.merriamwebster.com/dictionary/pattern ») (ECF No. 91).

[26] *See* Pattern, Merriam-Webster Online Dictionary, available at « www.merriamwebster.com/dictionary/pattern ».

[27] *See* Random, Merriam-Webster Online Dictionary (emphasis added), available at « www.merriamwebster.com/dictionary/random ».

[28] *See, e.g., Welded Line Pipe From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 61366 (Oct. 13, 2015), and accompanying Issues and Decision Memorandum at 20 (emphasis added) .

In other words, Commerce itself has taken the position that a "pattern" exists within the meaning of the statute only when the evidence permits rejection of the "null hypothesis" that the observed price differences reflect nothing more than random fluctuations. And, tellingly, Commerce's Redetermination made no effort to explain why Commerce's original understanding of the statutory requirement, which conformed to the ordinary meaning of the term "pattern," was incorrect.

The Statement of Administrative Action ("SAA") makes clear that statutory provisions authorizing the use of an average-to-transaction methodology were intended to address instances of "targeted dumping" — that is, situations in which "an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions."[29] But it also indicates that findings that such "targeted dumping" exists must be made on a "case-by-case" basis, "because small differences may be significant for one industry or one type of product, but not for another."[30] An interpretation of the term "pattern" to require only "a frequent or widespread incidence" of price differences is not consistent with those concerns. To comply with the requirements of the statute, the term "pattern" must, instead, be given its ordinary meaning, requiring consistent price differences that are beyond something that might be expected to occur by chance.

---

[29] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103–316 (1994) at 172-73.

[30] *Id* at 173.

## 2. The Two-Percent Test Does Not Distinguish Patterns from Random Fluctuations

The purpose of measures of "effect size" (such as Cohen's *d*) is to determine the "power" of a test — that is, to assess the ability of the test to reject the null hypothesis that observed difference arise through random processes. As Dr. Ellis has explained, "Statistical power describes the probability that a test will correctly identify a genuine effect."[31] Professor Cohen proposed his "power" analysis (using his *d* test statistic and other measures of effect size) precisely for the purpose of distinguishing between true patterns and chance fluctuations. The very first sentence of Professor Cohen's textbook explains that "The power of a statistical test is the probability that it will yield statistically significant results...."[32] And, as Professor Cohen demonstrated, the statistical power of any test can be calculated (as long as the required criteria are satisfied) solely from the value of the appropriate effect-size statistic and the number of data-points.[33]

When used properly, then, any individual iteration of an effect-size test will create evidence as to whether the observed differences constitute a true pattern. It is even

---

[31] *See* Ellis, Paul, *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results* (2010), at 52 .

[32] *See* Cohen, Jacob, *Statistical Power Analysis for the Behavioral Sciences* at 1 (2d ed. 1988) .

[33] In tables set forth in his text, Professor Cohen calculated the likelihood that any result was statistically significant, based on the number of observations, the effect size (either assumed or measured), and the desired level of statistical significance. *See id.* at 27-39, 83-95, 150-63, 185-98, 227-49, 288-356, 414-24 .

Crucially, these calculations were derived solely from mathematical analysis. And the analysis for Professor Cohen's *d* test statistic, in turn, explicitly required the assumption that the data contained a sufficient number of datapoints, was drawn from Normal distributions, and had roughly equal variances. *See id*. at 27 ("The power tables are designed to yield power values for the *t* test for the difference between the means of two independent samples of equal size drawn from normal populations having equal variances.") .

- 11 -

possible to calculate the likelihood that observed differences reflect a real "effect" based on the measured effect size and the number of data points considered.[34]  For that reason, the respondent in the *Stupp* case did not object to the use of Cohen's *d* or an alternate measure of "effect size" — as long as the assumptions necessary for use of the particular measure have been satisfied.[35]

However, that logic does not apply to the "two-percent" test employed in the Redetermination.  The two-percent test is simply the result of comparing average prices.  It is not a recognized measure of "effect size."  And it completely fails to consider the possibility that the observed differences in average prices may have arisen through random processes as a result of the internal variability of prices within a market.

Commerce previously rejected the use of the two-percent test for precisely this reason.  As mentioned, Commerce's decision in the *Nails* case observed that:

> {T}he two-percent price difference threshold does not adequately account for price variations specific to the market in question. In so doing, the P/2 test may find targeted dumping in many cases when arguably no such dumping is occurring. Thus, we do not find the results of this test to be a reliable indicator that "obvious" targeted dumping has occurred....[36]

In short, as Commerce has admitted, one can only determine whether an observed price difference is significant if one has first identified what sort of price variations are usual for the market in question.  Nothing in the Redetermination provides a basis for rejecting that conclusion.  Consequently, there is no mathematical or logical basis for believing that the two-percent test alone — or the combination of the two-percent test with a 33-percent

---

[34] *See, e.g., id.* at 27-39, 83-95, 150-63, 185-98, 227-49, 288-356, and 413-24 .

[35] *See Stupp V.*

[36] *Nails* I&D Memorandum at Comment 7.

"Ratio Test" — is capable of distinguishing patterns from random fluctuations of prices in the specific market.

It is well-settled that "An agency is obligated to follow precedent, and if it chooses to change, it must explain why."[37]  In addition, when Commerce's changes an established methodology it "…must also provide a reasoned explanation for the change, and it must demonstrate that its explanation is in accordance with law and supported by substantial evidence."[38]  Commerce has failed to satisfy these requirements in this case.

The Redetermination does suggest that its previous concerns about the use of the two-percent test in the *Coated Paper* case were irrelevant, because its modified Differential Pricing Analysis employs the two-percent test in a more repetitive manner.  According to Commerce, the rejected "P2" test only compared the average prices for allegedly "targeted" sales to the average prices for all other sales.[39]  By contrast, the modified Differential Pricing Analysis undertakes a comparison of average prices for sales to every single customer and in every single time period and region to the average price for all other sales.[40]  But the repetitive application of the two-percent test does not eliminate the problem that Commerce previously identified:  Whether applied just once or over-and-over again, the two-percent test "does not ... account for price variations specific to the market in question."  Commerce has, therefore, failed to justify modifying its Differential Pricing Analysis and use of the two-precent test to identify significant price differences.

---

[37] *See, e.g., Masters, Mates and Pilots Maritime Advancement, Training, Education and Safety Program v. Department of Commerce,* 729 F.2d 748, 755 (Fed. Cir. 1984).

[38] *Clearon Corp. v. United States*, 37 ITRD 1951, *24 (CIT 2015).

[39] *See* Redetermination at 13 (ECF No. 91).

[40] *See id*. (ECF No. 91).

### 3. The Ratio Test Portion of the Differential Pricing Analysis Is Not Sufficient to Establish that a "Pattern" Exists

Commerce's Redetermination asserts that the "pattern" requirement of the statute is satisfied through application of the "Ratio Test," and that the test used to determine the "significance" of price differences is wholly independent of the test used to determine whether a "pattern" exists.[41]  It also asserts that "The Federal Circuit has upheld Commerce's ratio test as a reasonable method for addressing the pattern requirement of section 777A(d)(1)(B)(i) of the Act...."[42]

As an initial matter, we note that there is simply no basis for Commerce's assertion that the Federal Circuit's 2021 decision in *Stupp* upheld the "Ratio Test" as a reasonable implementation of the statutory "pattern" requirement.  In fact, it was never argued in that proceeding, and the Federal Circuit's decision never claimed, that the "Ratio Test" by itself reasonably distinguished between true patterns and chance fluctuations.  Instead, the Federal Circuit's decision held only that the 33- and 66-percent cut-offs selected by Commerce represented a reasonable *policy* choice:

> Commerce's selection of the 33% and 66% cutoffs is a reasonable choice. An alternative approach might be, for example, to use a single cutoff at 50%. That approach would undoubtedly favor some respondents—the more frequent application of the average-to-average method would result in more de minimis dumping margins—but it would disfavor other respondents. For example, respondents having slightly more than 50% of their sales passing the Cohen's d test would have the average-to-transaction method applied to all of their sales. Commerce's approach is less rigid, providing a middle ground between 33% and 66%, in which the average-to-transaction method is only partially applied. That approach provides a better fit, minimizing both the assessment of antidumping duties that are too high and the

---

[41] *See id.* at 16 (ECF No. 91).

[42] *Id.* (ECF No. 91).

assessment of duties that are too low. We conclude that Commerce's cutoffs are reasonable in light of the alternatives.[43]

Nothing in the Federal Circuit's reasoning states that the 33- and 66-percent thresholds represent a reasonable tool for distinguishing true patterns from random fluctuations. Such a conclusion would require a mathematical analysis of the likelihood that a ratio of 33 or 66 percent is unlikely to have occurred by chance, not general statements about how different cut-offs might affect respondents as a reasonable method for addressing the pattern requirement is simply false.

Furthermore, even if the "Ratio Test" were a reasonable implementation of the statutory "pattern" requirement when a standard and appropriate measure of "effect size" is used to determine "significance," there is no reason to believe that the "Ratio Test" satisfies the "pattern" requirement when used with an arbitrary test of "significance" like Commerce's two-percent test. It undoubtedly is necessary to have some mechanism for interpreting the results of dozens or hundreds of individual effect-size assessments, when a statistically-valid effect-size test is being used to distinguish random fluctuations from situations that potentially demonstrate the existence of a "pattern." It is a far different matter when the test of "significance" is unsuitable for making such distinctions.

### 4. Commerce Has Failed to Satisfy Its Burden of Proof to Establish that a "Pattern" Exists

Commerce's authority to depart from the usual average-to-average or transaction-to-transaction comparison methodology is explicitly described by the statute as an "exception" to the normal rule.[44] As the Federal Circuit has held, this type of statutory

---

[43] *See Stupp III,* 5 F.4th at 1355.

[44] *See* 19 U.S.C. § 1677f-1(d)(1)(B).

- 15 -

structure imposes the burden of proof on Commerce to demonstrate that the statutory

prerequisite has been satisfied.[45]  Consequently, it is not respondent's burden under the

statute to demonstrate that there is no "pattern" of U.S. prices that differ significantly

among purchasers, regions, or periods of time.  If Commerce fails to demonstrate based on

substantial evidence that the "pattern" exists, then it is not permitted to utilize the average-

to-transaction methodology.

Commerce's revised Differential Pricing Analysis completely fails to satisfy that

burden.  Indeed, the Redetermination explicitly rejects the notion that it must demonstrate

that any observed price differences were not the result of chance.[46]  As a matter of law,

Commerce cannot assume away its burden to make a factual finding that a true pattern

exists based on substantial evidence on the record.

> C.  *The Two-Percent Test Does Not Comply with*
> *the SAA's Requirement that Commerce's*
> *Analysis Take Into Account the Significance of the*
> *Observed Differences for the Industry and Product*

The statutory provisions concerning the use of average-to-average and average-to-

transaction comparisons was added to the statute as part of the Uruguay Round

Agreements Act.  The SAA accompanying that Act provided the following explanation as

to how it was to be applied:

> {T}he Administration intends that in determining whether a pattern of
> significant price differences exist, Commerce will proceed on a case-

---

[45] *See, e.g.*, *Creswell Trading Co. Inc. v. U.S.*, 15 F.3d 1054, 1060–61 (Fed. Cir. 1994)
("The 'if' clause … sets forth on its face a statutory condition that Commerce must
establish before it may exercise its right to levy a countervailing duty against an
investigated party, as opposed to an exception into which that party must prove its actions
fall. The ultimate burden of proof is thus upon Commerce to establish by a preponderance
of the evidence" that the statutory condition has been satisfied.").

[46] *See* Redetermination at 15-16 (ECF No. 91).

Public Document

by-case basis, because small differences may be significant for one industry or one type of product, but not for another.[47]

That instruction is binding on Commerce: The Uruguay Round Agreements Act itself explicitly adopted the SAA as an "an authoritative expression by the United States concerning the interpretation and application of the {URAA} … in any judicial proceeding in which a question arises concerning such interpretation or application."[48]

In these circumstances, the statute does not contemplate that a simple, uniform test will be used to determine whether significant price differences exist. Instead, the statute requires Commerce to consider whether any differences that it observes are significant for the particular industry or product. Commerce's one-size-fits-all two-percent test fails to comply with that directive.

The Redetermination does not purport to explain why a two-percent difference between average prices is "significant" and indicative of a "pattern." Instead, it has justified the use of the two-percent threshold simply by reference to the use of two-percent cut-offs in other contexts — in particular, when determining whether a dumping margin is *de minimis,* or whether the prices for sales to home-market affiliates are equivalent to arm's-length prices.[49] But those other situations are plainly distinguishable. In particular, the two-percent threshold for *de minimis* dumping margins is established by statute.[50] And the statute, in that context, does not require a "case-by-case" analysis, and does not allow

---

[47] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103–316 (1994) at 173.

[48] 19 U.S.C. § 3512(d).

[49] *See* Redetermination at 13-14 (ECF No. 91).

[50] *See* 19 U.S.C. § 1677b(b)(3).

Commerce to consider whether "small differences may be significant for one industry or one type of product, but not for another." Similarly, the analysis whether home-market sales to affiliates are at arm's-length is a rule of practice adopted by Commerce that, once more, is not based on explicit statutory language requiring Commerce to employ a "case-by-case" analysis or to consider whether "small differences may be significant for one industry or one type of product, but not for another."

    D.   *Commerce's Elimination of the Court-Approved "Mixed Methodology" Was Beyond the Scope of the Remand in This Appeal*

As mentioned, the Federal Circuit's 2021 decision in the *Stupp* appeal upheld both Commerce's use of the "mixed" methodology when between 33 and 66 percent of U.S. sales "pass" the significant price difference test, and Commerce's use of the average-to-transaction methodology for all sales when more than 66 percent of "pass" the significant price difference test.[51] Nothing in the Federal Circuit's decision in the second *Stupp* decision called that conclusion into question. Instead, the Federal Circuit's decision addressed only the test used by the Department to determine whether observed price differences were "significant."[52]

Commerce's Redetermination nevertheless eliminated application of the "mixed methodology" in all cases, and applied the average-to-transaction methodology whenever more than 33 percent of U.S. sales "pass" the significant difference test. According to Commerce,

> The statute does not require Commerce to use a "mixed method" as an alternative comparison methodology. While the statute permits

---

[51] *See Stupp III,* 5 F.4th at 1355.

[52] *See Stupp V.*

Commerce's previous policy that adopted a hybrid version of the A-to-A method and the A-to-T method, Commerce's revision to the differential pricing analysis aligns more closely with the statutory text, which permits Commerce to use the A-to-T method when certain conditions set forth in section 777A(d)(1)(B) of the Act are satisfied. In light of the foregoing, Commerce does not consider it necessary to continue to use the mixed method, particularly when discontinuation of the mixed method enhances the ability to address masked dumping, which is consistent with the objective of the statute, and more closely aligns with the statutory language that expressly authorizes the use of the A-to-T comparison method when the conditions set forth in section 777A(d)(1)(B) of the Act are satisfied..[53]

But, whatever the merits of Commerce's view about the statute's requirements, it is clear that the elimination of the "mixed methodology" goes well beyond the scope of the remand in this appeal.  The remand order in this case directed Commerce to address the Federal Circuit's finding that Commerce's use of Cohen's *d* was unreasonable, not to reconsider whether the statute's objectives are best satisfied by using a "mixed methodology."[54]  In such circumstances, Commerce's elimination of the "mixed methodology" is beyond the scope of its authority in this appeal.[55]

---

[53] *See* Redetermination at 22 (ECF No. 91).

[54] *See* Court's August 20, 2025, Order (ECF No. 89) (remanding the case based following the joint status report filed on August 18, 2025) and Parties' August 18, 2025, Joint Status Report (ECF No. 88) (agreeing that the Court should remand the case to comply with the Federal Circuit's decision in *Stupp V*).  *See also Stupp V* at 6 ("Accordingly, we hold that it was unreasonable for Commerce to use Cohen's *d* as part of its differential pricing analysis in this case.  We vacate the judgment of the Trade Court and remand for that court to remand to Commerce, which may re-perform a differential pricing analysis without relying on Cohen's *d*.").

[55] As the Federal Circuit has observed,

The Supreme Court has stated:

The circuit court is bound by the decree as the law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further

*(footnote continued on following page)*

Public Document

By eliminating the "mixed methodology," Commerce effectively lowered the threshold —from 66 to 33 percent — that is used to determine whether the average-to-transaction methodology should be applied.  Yet Commerce has offered no justification for changing the Ratio-Test threshold that was expressly upheld by the Federal Circuit.[56] Without some explanation as to why the change in another part of the Differential Pricing Analysis warrants reconsideration of the Ratio Test, Commerce's Redetermination cannot be sustained.[57]

Finally, we note that Commerce's sole justification for the prior version of the Ratio Test was its "experience" in administering the antidumping laws.[58]  In any other Circuit,

---

*(footnote continued from previous page)*

> relief, or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.

> By the same token, the trial tribunal, in this case the Board, "has no power or authority to deviate from the mandate issued by an appellate court." The mandate constitutes the law of the case on issues that were either explicitly or implicitly decided by the appellate tribunal. Thus, a trial court on remand may not reexamine, beyond the scope of the remand order, any issues that were addressed, either explicitly or implicitly, by an appellate court.

> While a number of the decisions cited supra speak to the scope of remand to a district court, these same standards apply to administrative agencies.

*Aydin v. Widnall*, 121 F.3d 726 (Fed. Cir. 1997) (internal citations omitted).

[56] *See* pages 15-16 above.

[57] Even if one were to accept the use of the Ratio Test's cut-offs in connection with the use of Cohen's *d*, it is certainly possible that different numerical cut-offs might be justified with a different measure of "effect size."  Commerce has offered no such justification in its Redetermination.

[58] *See, e.g., Tri Union Frozen Products,* 163 F.Supp. 3d 1255, 1308 (CIT 2016).

Public Document

such a justification would have been deemed wholly inadequate.[59]  But, if the Federal Circuit is to allow Commerce to establish rules based solely on "experience," then any changes in the rules must also be justified by documented changes in Commerce's "experience."  Commerce has offered no such explanations in this case.  As a result, its attempt to eliminate the "mixed methodology" cannot be sustained.

CONCLUSION

For the foregoing reasons, we respectfully request that the Court remand this matter to Commerce once more for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Michael J. Chapman
Amrietha Nellan
Vi N. Mai
Rachel Hauser

WINTON & CHAPMAN PLLC
1100 13th Street NW, Suite 825
Washington, D.C.  20005
(202) 774-5500

Attorneys for HiSteel Co., Ltd.

May 29, 2026

---

[59] *See e.g.*, *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 88-90 (D.D.C. 2015) (finding that the 90-percent threshold selected by the Federal Highway Administration to effectuate the "Buy America" statutory mandate by "using its best judgment based on almost 40 years of experience and technical expertise in this area" was insufficient and that the agency was required to support the selected numerical threshold with a reasoned analysis grounded in record evidence for the threshold to be valid under the APA).

<u>Certificate of Compliance</u>

Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 5,760 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.

                                                                      /s/Jeffrey M. Winton

May 29, 2026